This is a suit by a real estate agent to collect a commission from a prospective *Page 84 
purchaser who is alleged to have made an offer to purchase a piece of real estate, and to have then refused to complete the purchase after the acceptance of the offer by the owner. The defense of the defendant is his averment that he signed the printed offer form in blank and that the real estate agent in filling it in afterwards inserted terms and conditions entirely different from those which had been agreed upon. From a judgment for the defendant the real estate agent has appealed.
Gerald L. Blache, the plaintiff, is a real estate agent in New Orleans. His father, J. Henry Blache, who, according to the record, has been a real estate agent for more than twenty-five years, was enployed in the office of his son, Gerald, in whose name the business is operated. Mrs. Josephine Larrain desired to sell a piece of improved residential real estate and "listed" it for sale with the Blache office. That office advertised it in a local newspaper.
Elbert H. Goodier saw the advertisement and, becoming interested, called at the Blache office on July 21, 1943, to discuss the matter with J. Henry Blache, and agreed to make an offer of $7,000 for the property. He says that he explained to Blache that he could not pay the entire amount in cash and that it would be necessary that he make his offer subject to a homestead loan in the sum of $5,400. He says too that on that day he was anxious to return to his office as soon as possible, as he was interested in a War Loan Drive which was being conducted, and that, therefore, he signed three triplicate original offer forms in blank under the agreement that Mr. Blache would fill them out but would hold them until the next day when he could return to check them over to see that they were filled out in accordance with his verbal understanding. These triplicates were on standard forms adopted and approved by Real Estate Board of New Orleans, Incorporated, and bore at the top the name "Gerald L. Blache". On them, among other stipulations, was the following:
"If this offer is accepted _____ will deposit with vendor's agent immediately in cash __________ dollars."
He says that on the next morning he telephoned to the Blache office to say that he could not come until later and that at that time he reported to Blache that he and Mrs. Goodier and Mrs. Goodier's father and mother had been to the property and had found that children of the tenants were "pumping water on the floors of the house and so forth". He says that he did not mention this as an objection to taking the property but merely because he thought that the owner should notify the tenants to put a stop to such acts of vandalism. He says also that at that time "not a word was mentioned" by Blache about Mrs. Larrain's having already accepted the offer.
Blache says that the forms were fully filled out and dated when Goodier signed them, and that there was no agreement that the offer was to be subject to a homestead loan. He submitted the offer to Mrs. Larrain on that day and she signed her acceptance of it at once.
He states also that although Goodier did say that he did not have sufficient cash for the entire purchase price, he said that he thought that he could borrow enough from his father-in-law and mother-in-law who "were going to buy with him" or from some other source, and that he mentioned the fact that the store in which he had been employed for many years had a "bureau for lending" and that he might be able to borrow the balance from that bureau.
Blache testified that he told Goodier that $7,000 cash was the "rock bottom" price which Mrs. Larrain would accept and that he knew this since she had just refused a similar offer because it contained a "potestative" or homestead clause.
He explained that since he knew that Mrs. Larrain would accept nothing less than $7,000 cash, he had already prepared a set of forms, inserting the price "$7,000.00 cash" and that he intended to use these should anyone offer that amount, and that as Goodier agreed to offer that amount he used these forms and merely had the date of the offer and the date of its expiration written into them, and that then Goodier signed them. And that Goodier agreed that the offer would be presented to Mrs. Larrain at once, and that if she would accept it, as Blache knew that she would, he, Goodier, would return on the next day and make the deposit of $700 as required by the offer.
Blache further says that at about 10 o'clock on the next morning, Goodier 'phoned him and asked whether the offer had been accepted, and was told that it had been and that Goodier then said that he was busy on the War Loan Drive and "would see me about 1 o'clock", but that *Page 85 
at 1:30 or 2 o'clock he telephoned to say that his mother-in-law and his father-in-law had been to see the house, and had found children "pumping water into the back room", and that his father-in-law was the one who was going to put up some of the money with him to buy it and that they "were about to change their mind".
Goodier came in again about 2:30 o'clock that afternoon and Blache says that he looked at the agreement and the acceptance and was shown a letter which Blache was about to send to him confirming the sale and was also shown a receipt which was to be given him for the deposit.
Goodier demanded one of the executed triplicate originals of the agreement but refused to make the deposit. Blache refused to give him one of the triplicate originals.
Goodier then called on Mr. Alvin P. Frymire, an attorney, and Mr. Frymire telephoned to Blache. He says that he advised Goodier not to make the deposit until he could first make certain that the offer contained a stipulation that it was subject to a homestead loan in the sum of $5,400, and that he sent Goodier back to Blache to request a "copy" of the contract. He says, too, that Goodier returned and said that Blache had refused to give him a copy and that therefore he had telephoned to Blache, and that in that conversation "I was not as well pleased as I would like to have been"; that Blache refused to give him a "copy" of the contract and that his "recollection" was that Blache had also said that he would not let him see the contract.
Blache testified that he was at all times willing for Mr. Frymire to see the contract and that Goodier did see it, and that what they both wanted was not a copy but one of the triplicate originals, and that he would not give them one of the originals because Goodier had not put up the deposit. He gave the following reasons for his refusal to deliver one of the triplicate originals without first receiving the deposit: * * * after you advise them that the offer has been accepted, if you turn them over the agreement, they will delay five or six or ten days before making the deposit, and they will change their mind, or they will take that agreement, maybe, and record it, and it would take you two or three months to get it straightened out, and in the meantime you would have the client's property tied up and you couldn't sell it to anybody else. * * *" An impasse resulted from Goodier's refusal to make the deposit. Thereafter Goodier caused his attorney to write to Blache a registered letter stating that he would not make the deposit, and confirming his "withdrawal of the offer".
A few days later, after this letter of withdrawal had been received, Blache, in cooperation with another real estate agent, found another purchaser for the property at the same price. The property was sold and a commission was paid, which was divided equally between Blache and the other agent.
Before discussing the question of fact which is presented by the charge of Goodier that he signed the offer in blank and the statement of Blache that the offer was already fully filled in when Goodier signed it, we must dispose of a question of law which arises as a result of the fact that the same property was later sold to another purchaser and that out of the purchase price Blache received a commission of one-half the amount he would have received had the Goodier offer ripened into a sale.
The District Judge in his reasons for judgment referred to the fact that the second sale was made without the bringing of a suit for specific performance against Goodier, and counsel argue that by making this second sale Mrs. Larrain, the owner, and Blache, the agent, acquiesced in Goodier's withdrawal and thus waived any claim against Goodier if any had ever existed. It seems to be their contention, and this is hinted at by the District Judge, that only by bringing a suit for specific performance against Goodier could any rights under the alleged contract have been preserved.
[1] In this counsel is in error. Goodier had already given notice by registered mail that he repudiated the offer and had withdrawn, and had said that he would not make the deposit or proceed further in the matter. Mrs. Larrain and Blache were both entitled to seek another purchaser and Blache was entitled to assert any claim which he may have had against Goodier.
[2] It is settled that a broker is entitled to his commission as soon as he has obtained a purchaser ready, willing and able to buy at the price agreed upon by the owner, and that the commission is due by the prospective purchaser if, after binding himself, he refuses to comply with his *Page 86 
agreement. See Brugier v. Ritchie, 7 La. App. 179; Broomes Printing Office v. Louisiana Margarin Co., 8 La. App. 188; McWilliams v. Stackhouse, 1 La. App. 253; Palmisano v. Stewart, 3 La. App. 66; Dauterive v. West India Transportation Corporation, 3 La. App. 319; Prince v. Mrs. St. Aurin, 5 La. App. 567; Stoer v. Pearson, 5 La. App. 609.
In Clesi v. Thacher, 12 La. App. 55, 125 So. 194, 195, we held that where the purchaser has definitely withdrawn and has stated that he would not comply with his offer, there is no necessity that he be put in default and that he is liable at once for the commission of the agent. Note the following from that decision:
"The trial court found that no tender of title to the Goldstein property had been made within the 60 days mentioned in the contract, during which time Thacher's offer was to be irrevocable, and held this circumstance fatal to plaintiff's recovery.
We are unable to agree with our brother below. Clesi's claim for his commission was not affected by a failure of Goldstein to put Thacher in default. To begin with, Thacher admits that he refused to carry out the agreement and thus actively breached the contract making a putting in mora unnecessary. A real estate agent earns his commission when he procures a purchaser willing and able to buy the property he has for sale, whether the sale is consummated by the vendor or not. Gurley 
Parkinson v. Loeffler, 14 Orl.App. 424; Steppach v. S.E. Worms Co., Ltd., 7 Orl.App. 214; * * *."
[3] It is suggested further that since a commission has been collected on the sale of the same property, Blache has sustained no loss, or, at worst, has sustained a loss of only one-half of the commission. The fact that, by again exerting his efforts, Blache obtained a second purchaser, cannot be used as a reason for denying him recovery of the first commission which was fully earned when the offer of Goodier was accepted. He performed two services. For the second he has been paid; for the first he has received nothing.
When we come to consider the question of whether or not Blache refused to permit an inspection of the agreement, one thing stands out prominently. It is very evident that it was not a copy of the agreement which Mr. Goodier and Mr. Frymire, his attorney, wanted but that they demanded one of the triplicate originals. We say this in spite of the fact that both Mr. Frymire and Mr. Goodier repeatedly used the word "copy" in their statements concerning what it was that Blache refused to give them.
Immediately after Mr. Frymire's telephone conversation with Mr. Blache in which he said that Blache had refused to let him have a copy of the agreement, he wrote a letter to Blache and in it he complained "that you have declined to furnish * * * one of the original triplicate copies * * *". And in the testimony of Mr. Frymire, though he had many times used the word "copy" he said that his complaint was that Mr. Blache "said he wasn't going to let me have the contract".
[4, 5] As to Goodier, we think it evident that he was referring to one of the triplicate originals because he so says in his answer, averring that he had refused to make the deposit "only after having been refused one of the triplicate forms * * *". And in his testimony, though he too had often referred to the refusal of Blache to give him a copy, he admitted that when he had called back at Blache's office he had asked for "a copy of the duplicate original contract * * *". Blache not only was within his rights in not surrendering to Goodier one of the completed original triplicates until the deposit had been made but it was his duty to Mrs. Larrain to refuse to do so. Of course, he would not have been within his rights in refusing to let Goodier see the contract, but we are not at all convinced by the record that he did refuse such an inspection. He says positively that Goodier did see it, whereas, on the other hand, Goodier is repeatedly evasive in answering the question whether Blache refused to let him see it. Although at two points in the narrative part of his testimony he says he was refused permission to view the contract, later, when asked the direct question whether one of the triplicates had been shown to him, he did not say "No" but said "I did not see any". And again he was asked: "Did he refuse to let you review the offer?" And again he did not make the simple, direct answer "Yes" but he made the more evasive statement: "I never saw it."
It is true that Mr. Frymire also referred to a refusal to permit the document to be seen. But even he did not say unequivocally that he was refused permission *Page 87 
to see it. He says that he was certain that Blache said "he was not going to let me have the contract" and followed this immediately by saying that his "recollection" was that "he wasn't going to let me see the contract". It must also be remembered that Mr. Frymire did not call at Blache's office in person but merely telephoned and that obviously be could not have "seen" the contract over the telephone.
The District Judge seems to have decided the case against Blache entirely on the ground that he refused to surrender one of the triplicate originals, or to permit Goodier or his attorney to see one of them or to see a copy. In his reasons for judgment he does not refer to the question of whether the offer was signed in blank but does state that Blache refused to allow the inspection of the offer, and that "it is most unusual for a broker or real estate agent to withhold from his principal a copy of his contract, and particularly is this true when that contract is made in original and two duplicate originals." We agree, of course, that it would be most unusual to say the least for a real estate agent to refuse to allow one of the parties to a contract negotiated by him to view the contract. In the first place, however, we do not believe that Mr. Goodier was refused permission to view the contract. It is not disputed that he was refused one of the triplicate originals but this refusal resulted from the fact that he had himself refused to make the necessary deposit and from the agent's belief that if he delivered a completely executed counterpart of the contract trouble might ensue, since Goodier had not only refused to make the deposit but had also made certain complaints which gave color to the fear that he was trying to find a way to avoid the effect of his offer.
[6] But whether he was refused a view of the contract or whether he was refused a copy are not questions upon which hang the outcome of this controversy. These questions did not arise until after all of the essential occurrences had already taken place. If Goodier signed the fully filled out offer then when that offer was accepted, the contract was complete. Liability under it did not depend on whether or not, on the next day, he was permitted to see it or to obtain a copy.
The entire question then is were the triplicate forms filled out when he signed them or did he sign them in blank after giving Blache instructions to insert "a homestead clause."
[7-9] There are two presumptions which come into play as a result of Goodier's charge that the documents had not been filled in when he signed them in blank. The first is that an experienced business man does not ordinarily sign an important document in blank, especially when he scarcely knows the party to whom he leaves the duty of filling in the terms and conditions, and the second is the presumption against fraud; and although Goodier has not charged fraud by the use of the word, if Blache did what Goodier says that he did, then he is guilty of fraud whatever the name by which his act is called.
[10] In addition to these presumptions let us examine the probabilities. Goodier says that he signed the documents in blank in order to save time but that he instructed Blache not to use them until he could return on the next day and look them over. The affixing of his signature required, of course, only a few seconds. Why then should he not have done the more usual thing? Why should he not have asked Blache to fill out the forms and have them ready for his signature on his return on the next day?
When Goodier called on Mr. Frymire and discussed with him the question of whether he should make the deposit he seemed not to have made any mention of his having signed the documents in blank. Not once in his testimony did Mr. Frymire say that Goodier had made this charge and he did not mention such a charge in his letter to Blache. His statement is that Goodier told him "that he had signed a contract with Mr. Blache's office to purchase a piece of property * * *" and we think it clear from Mr. Frymire's testimony that at that time he had no idea that there was involved any such question as is now presented.
There is one bit of physical evidence which goes far towards showing that Blache's statement is true. He says that he had prepared copies of the agreement in advance; that he had written them on a typewriter using carbon paper for all except the top or first one of these forms, and that he had filled them out in full except for the date and the date on which the offer would expire. He says that he held these forms ready for the first prospect who would offer $7,000 cash, and that when *Page 88 
Goodier agreed to make such an offer he took three of these prepared forms and handed them to his son, who was sitting at the typewriter, and that he asked him to insert the dates and that his son did so, putting the forms into the typewriter one at a time and without using carbon paper.
The record shows that these documents evidenced plainly the fact that the dates on all three of the triplicates are in the ink from the typewriter and not from carbon paper. If Blache had done what Goodier charges, it is inconceivable that he would have written the three triplicates using carbon paper and would then have taken them out and put each one into the typewriter separately for the filling in of the dates. At that time he knew the date on which Goodier was to sign and the date of the expiration, and surely if he had been filling out the entire document he would not have left the dates blank and filled them in separately later on. Blache's story is supported by his son even as to the details concerning the filling in of the dates which we have just mentioned.
Goodier offers no corroboration whatever of his statement that he signed in blank, though in fairness to him it must be said that under the circumstances he obviously could have found no one present except those inimicable to his interests.
[11] On the question of fact which is presented we would hesitate to reverse the findings of the District Judge were it not for the fact that, as we have said, he obviously did not decide the case on that point.
[12] A reading of the record convinces us that Goodier is mistaken in his statement that the documents were not filled in when he signed them. It necessarily follows that since he signed the completed contract which is sued on and in that document agreed that if his offer should be accepted he would take the property, and since he, without any proven legal cause, has refused to comply with his agreement, he is responsible for the commission of the plaintiff.
[13] We notice that in his petition plaintiff prayed for attorney's fees of $125. The contract contained a provision that if either party should fail to comply with the terms of the offer, in addition to the commission of the agent, he should be liable for "all fees and costs incurred in enforcing collection and damages". The legal work which was involved in preparing and trying this suit in the District Court and in presenting it before this court justifies a fee of $125.
It is therefore ordered, adjudged and decreed that the judgment appealed from be and it is annulled, avoided and reversed and that there now be judgment in favor of plaintiff, Gerald L. Blache, and against defendant, Elbert L. Goodier, as prayed for.
Reversed. *Page 126