ELLSWORTH DOBBS, INC., A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT, v. JOHN R. JOHNSON AND ADELAIDE P. JOHNSON, HIS WIFE, DEFENDANTS AND THIRD-PARTY PLAINTIFFS-RESPONDENTS, v. JOSEPH IARUSSI, THIRD-PARTY DEFENDANT AND DEFENDANT-RESPONDENT.

Argued October 9, 1967—Decided December 18, 1967.

532

*Mr. Thomas L. Morrissey* for plaintiff-appellant (*Messrs. Carpenter, Bennett & Morrissey,* attorneys; *Miss Virginia D. Fenton,* on the brief).

*Mr. William P. Westling* for plaintiffs-respondents John R. Johnson and Adelaide P. Johnson (*Messrs. Imbriani, Hughes, Westling & Lucas,* attorneys).

*Mr. Lee A. Holley* for defendant - respondent Joseph Iarussi (*Messrs. Holley and Kroner,* attorneys).

*Mr. Arthur M. Greenbaum* for New Jersey Association of Real Estate Boards appearing *amicus curiae* (*Messrs. Greenbaum, Greenbaum & Rowe,* attorneys; *Mr. Stanley Stern* on the brief).

The opinion of the court was delivered by

FRANCIS, J. Plaintiff Ellsworth Dobbs, Inc., a real estate broker, sued John R. Johnson and Adelaide P. Johnson, his wife, and Joseph Iarussi for commissions allegedly earned in a real estate transaction. The Johnsons, as owners of certain acreage in Bernards Township, New Jersey, and Iarussi as purchaser, entered into a written agreement, the former to sell and the latter to buy the property. There is no doubt that Dobbs brought the parties together, and into the signed

contract of sale. Title did not close, however, because of Iarussi's inability to obtain financial backing for his intended development of the property. After Iarussi's failure to perform, the Johnsons released him from the contract under circumstances to be detailed hereafter. Dobbs then brought this action charging the Johnsons with breach of an express agreement to pay a commission due for bringing about the contract of sale, and charging Iarussi with breach of an implied agreement to pay the commission if he failed to complete the purchase and thus deprived the broker of commission from the seller. The trial judge held, as a matter of law, that Dobbs' commission claim against the Johnsons vested upon execution of the contract of sale with Iarussi, and that the right to commission was not dependent upon the closing of title. Consequently, he declined to submit that issue to the jury for determination. Instead he instructed them that plaintiff was entitled to a commission against the Johnsons, and limited their function to a determination of the amount due. The jury found for Dobbs in the amount of $15,000.

As to the defendant Iarussi, the trial judge submitted this issue to the jury: Did the facts as they found them show by a preponderance of the evidence that Iarussi impliedly agreed with Dobbs' representative that if the representative located property satisfactory to Iarussi for residential development purposes, and the owner entered into a contract with Iarussi to sell the property on terms mutually agreeable, Iarussi would perform the contract and thus enable the broker to earn a commission from the owner? The jury found that there was such an implied agreement; further, that the implied agreement was breached by Iarussi's failure to perform his contract to buy the Johnsons' property. Therefore he became liable to the broker for payment of the commission. Since the jury had been charged that the amount of the verdict against Iarussi would have to be the same as that returned against the Johnsons, he was assessed $15,000.

On appeal the Appellate Division reversed the judgment against the Johnsons, holding that there was a jury question as to their liability to pay the commission to the plaintiff, and a new trial was ordered on this phase of the case. The judgment against Iarussi was reversed also, on the ground that the evidence was insufficient to show a contract, express or implied, under which Iarussi made himself liable to pay the commission Dobbs would have received from the Johnsons if Iarussi had performed his agreement to buy their property. On plaintiff's application, this Court granted certification. 48 *N. J.* 354 (1966).

I.

The Johnsons are the owners of a 144-acre tract of farm land in Bernards Township, New Jersey. They had placed it on the market for sale in 1960. It was listed with Dobbs and other agencies as available.

Prior to 1960, Iarussi had been connected with the building business. He decided to enter the residential development business on his own. Just when this decision was reached is not clear from the record, but it does appear that in early 1960 he consulted Theodore R. Fleming, Vice President of the Dobbs agency, about acquiring land in the area. As Iarussi put it, "I went out looking for land when I went into business for myself." According to Fleming, the gist of their conversation was that Iarussi wished Dobbs to assist him in finding properties on which he could build homes. Fleming was agreeable, and an understanding was reached that if Dobbs found property satisfactory to Iarussi and it could be bought on terms agreeable to him, Iarussi would make and perform an agreement of purchase with the owner, in which event Dobbs would earn its commission from the seller. Iarussi's testimony is somewhat unclear as to precisely what his arrangement was with Dobbs. In his answer to the complaint herein he admitted that he "solicited, obtained and utilized the services of plaintiff in

order to obtain lands which would be suitable for residential development by him." He said also he knew that if Fleming showed him land which he bought, Dobbs would receive its commission from the seller. And he conceded that after his first meeting with Fleming, he utilized Dobbs' services in contracting to buy at least four pieces of property. In each instance he completed the transaction and Dobbs earned the commission, which was paid by the sellers.

Sometime in 1960, Fleming showed the 144-acre Johnson tract to Iarussi. He was interested in it for residential development, but could not finance such a large undertaking personally and had to obtain backing from some source. Satisfactory terms were agreed upon with the Johnsons, and an oral agreement of purchase was made. Iarussi's hopes for financial support were not realized and the deal collapsed.

It seems plain that Iarussi's interest in the project remained high. In early 1961, he and the Johnsons again met in the Dobbs office, at which time Fleming told the Johnsons of Iarussi's renewed interest in acquiring their property. There is a dispute in the testimony as to what was said at the time about Iarussi's financial ability to consummate a deal. The Johnsons said that in view of their previous experience they expressed skepticism on that score at that interview, whereupon Fleming assured them that Iarussi had or would have by the closing date sufficient financial backing to undertake a development of the proportions contemplated. They said further that Fleming told them he was not at liberty to reveal the source of the backing, but he assured them it existed. Moreover, according to the Johnsons, Fleming said if they went along with Iarussi, Dobbs would pay all the legal expenses. Fleming testified he agreed only to pay the legal fee for drawing the contract of sale. As a result of these assurances, on May 1, 1961 the Johnsons entered into a contract to sell their property to Iarussi for $250,000, title to close on September 1, 1961.

According to Iarussi, at this meeting in the Dobbs office he indicated his interest in the Johnson property and

in trying to obtain financial backing to undertake the residential development thereon. He asserted also that thereafter on a number of occasions he discussed with Fleming his hopes of obtaining the necessary support, and that Fleming offered to assist him in any way he could. He denied he ever informed Fleming that he had secured such backing. Nevertheless, he entered into the purchase contract on May 1, 1961, with the closing date fixed at September 1, with the expectation of obtaining the necessary backing in the interim.

On the other hand, Fleming asserted that on the renewal of the negotiations in 1961 Iarussi neither asked for assistance in securing financing nor discussed the matter at all. He said further that Iarussi simply indicated he would go through with the purchase at the original price of $250,-000, if the Johnsons would reduce the down-payment to $10,000. When this was agreed upon the contract was signed. In this connection it may be noted that at the time of execution, the contract provided for a down-payment of $10,000. Three days later, however, by an addendum, this was changed to $1,500 on execution of the contract, an additional $1,000 on June 15, and $10,000 on passing of title.

After this addendum was executed, the contract provided for the payment of the purchase price of $250,000 as follows:

"On execution of the contract etc. . . . . . . . $   1,500
Further, on June 15, 1961 additional . . . .      1,000
On passing of title . . . . . . . . . . . . . . . . . . . .    10,000
On purchase money mortgage, etc. . . . . . . .   237,500"

The original agreement provided also that the purchase money note and mortgage would contain a clause releasing one building lot sold from the lien of the mortgage upon payment of each $2,500.

With respect to the broker's commission, the contract provided:

"The commission hereinafter mentioned shall be payable as follows: $5,000.00 when sellers shall have received a total of $25,000.00 on account of the above purchase price ($10,000.00 herewith and $15,000.00 on account of the principal sum of the above mentioned purchase money note and mortgage) ; an additional $5,000.00 when an additional $25,000.00 shall have been paid on account of the principal sum of purchase money note and mortgage; and the remaining $5,000.00 when an additional $25,000.00 shall have been paid on account of the principal sum of said purchase money note and mortgage. The entire commission of $15,000.00 shall become immediately due and payable upon any sale or assignment by sellers of said purchase money note and mortgage.

\*    \*    \*    \*    \*    \*    \*    \*

And the Seller hereby agrees to pay to Ellsworth Dobbs, Inc. a commission of Six (6) % on the purchase price aforesaid, said commission to be paid in consideration of services rendered in consummating this sale; said commission to become due and payable as above mentioned."

Iarussi made the two payments totaling $2,500, but by September 1 he had not been successful in securing the financial backing necessary for his development project. Consequently, he requested an extension of time from the Johnsons, which, according to their testimony, they granted when he agreed to pay the taxes on the land between September 1 and the closing date, and also to pay interest on the purchase price during that period. Iarussi denied he made any such specific agreement. He testified, however, he did not want to lose the deal, so he made "various statements" to the effect that he "would have to find a backer first and \* \* \* [he] would see what [he] could work out." In an affidavit he filed on the subject, he said he "never denied he would pay the Johnsons something for interest and taxes but at the same time [he] thought [he] could work out something reasonable and fair for all parties" concerning such payment.

After receiving the extension of time, Iarussi continued his search for financing. The Johnsons assisted him in this regard. In fact they were with him at conferences with representatives of three separate groups which were considering the matter. In January 1962 the Johnsons visited

Fleming's office and complained about the lack of progress, as well as his failure to locate financial backing for Iarussi. At that time, they said, Fleming agreed he would reduce the Dobbs' commission from $15,000 to $10,000 if they would send a "time-of-the-essence" letter to Iarussi fixing February 20, 1962 as the closing date. They consented, and on January 31 Fleming wrote them saying Dobbs understood the total commission on the sale of the property "shall be $10,000." Thereafter Fleming had the "time-of-the-essence" letter to Iarussi prepared and it was sent to him on February 9.

On February 20 the parties, including Fleming and an attorney representing Iarussi's long-sought backer, appeared at the time and place of closing. A dispute arose about Iarussi's payment of the taxes and interest the Johnsons said he had agreed upon, and the closing failed. On the same day Iarussi, believing he then had the necessary financial backing for his project, instituted a specific performance suit alleging he was "ready and willing to pay the purchase price and now offers to do so." The Johnsons filed an answer denying they had failed to perform, asserting their continued willingness to do so, and they requested the court to set a time and place for the closing and the payment of the purchase price. They also counterclaimed demanding specific performance and a judgment for the interest and taxes Iarussi had agreed to pay.

Since both parties had indicated their willingness to perform, the trial court, on motion, entered summary judgment for the Johnsons and ordered that the parties agree upon a time and place not later than May 15, 1962 for closing, at which time, upon tender of a deed, Iarussi should complete the transaction. The Johnsons' claims for damages set forth in the counterclaim, including that for the interest and taxes between September 1, 1961 and the date of closing, were ordered transferred to the Law Division for trial.

The closing was set for May 15. According to Iarussi, he received word on May 14 that his backer had withdrawn and

would not provide the necessary financing. On May 15 the parties, including Iarussi, and their respective attorneys, as well as Fleming, appeared at the place of closing. Iarussi announced his inability to complete the transaction. According to his affidavit on the motion for summary judgment in the present action, he realized he was faced with a suit for the taxes and interest on the purchase price from September 1, 1961 and with a court order directing him to complete a purchase contract he was "unable to fulfill." His attorney advised him he was in serious legal trouble. He became upset, left the closing and went home.

There is no doubt that the Johnsons were ready and willing to close the title on that day. When the proceedings were aborted, they were faced with a serious dilemma. The order for specific performance had not been fruitful. The property which they were anxious to sell had been tied up for more than a year by the Iarussi contract. They had been subjected to litigation and other expenses. They were advised by their attorneys that further litigation with Iarussi might well tie up their land for an indefinite period of time. So they concluded they had no choice but to "rescind the contract," since they were interested in selling the land. They were aware that Dobbs alleged "certain claims" for commission even though title had not passed, and that the other various contingencies contemplated by the contract of sale had not occurred through no fault of theirs. Further they assert that they would not have made the agreement to sell if they had not been assured by Fleming of Iarussi's financial capacity to perform. These considerations led to discussion with Iarussi and his attorney concerning disposition of the matter, and apparently later in the day on May 15, 1962, to the execution of written mutual releases between them, discharging each from all obligations to the other under the contract of sale.

The Johnsons had received a $2,500 deposit under the sale contract. According to the release they agreed to repay this sum to Iarussi when, as and if their property was sold and

they received from the buyer not less than $25,000 cash on account of the purchase price. Iarussi agreed to provide them with all maps, surveys, plans and engineering data pertaining to preliminary subdivision approval which were in his possession or control. The pending Superior Court action was to be dismissed. Finally, Iarussi stipulated he would save the Johnsons harmless from any commission claim by Dobbs. Thereafter Dobbs brought this action against the Johnsons and Iarussi claiming $15,000 as earned commission plus interest from May 15, 1962, the date of the mutual releases between the defendants.

At the trial the Johnsons claimed primarily that Dobbs' right to commission was contingent upon closing of title; that such was not only the clear meaning of the language of the sale contract, but it was the understanding of the parties. They contended further that if the court would not hold as a matter of law that the failure of Iarussi to complete the transaction barred the claim for commission, the most that could be said against their position was that the contract was ambiguous as to when the broker's right accrued. Therefore, they urged that parol testimony was admissible to explain the ambiguity and to show the parties' understanding that commission was to be considered earned only upon closing of title. With respect to the so-called "settlement" made with Iarussi after his refusal to close title, they contended they had simply salvaged what they could out of a bargain they wanted to complete, but which was unilaterally frustrated by him. In return for releasing him they received nothing that could possibly be considered as an equivalence for the loss of their bargain. The trial judge disagreed. He held that in light of the established law of this State, the language of the contract made the commission earned upon the execution of the contract of sale by the buyer and the sellers, and merely postponed payment to the times specifically prescribed. Moreover, he said that even if payment of commission was contingent upon closing of title, the sellers

removed the contingency when they obtained the judgment for specific performance against Iarussi.

With respect to the broker's claim against Iarussi, the trial court said, as we have noted above, that the circumstances proved at the trial raised a factual issue for jury determination: by failing to perform the contract of purchase, did Iarussi breach an implied agreement with the broker to complete the transaction, and thus make himself liable for the commission Dobbs would have received from the Johnsons if title had closed?

As will appear hereafter, we disagree with both aspects of the trial court's ruling against the sellers, and unlike the Appellate Division we agree that a jury question existed as to the buyer's liability.

## II

### THE SELLERS' LIABILITY TO THE BROKER

#### A.

Corbin notes that there has been an immense amount of litigation over the years with respect to the commissions of land brokers. 1 *Corbin on Contracts* § 50 (1963). Almost a century ago, the former Supreme Court ruled that when a broker who had been duly authorized by the owner to find a buyer for his property produced a willing and able purchaser who entered into a contract to buy on terms agreeable to the owner, the broker had fulfilled his undertaking and his right to commission from the owner was complete. *Hinds v. Henry*, 36 *N. J. L.* 328 (*Sup. Ct.* 1873). The doctrine has been with us ever since. *Blau v. Friedman*, 26 *N. J.* 397 (1958); *Alnor Constr. Co. v. Herchet*, 10 *N. J.* 246 (1952); *Hedden v. Folio*, 62 *N. J. Super.* 470 (*App. Div.* 1960); *Winter v. Toldt*, 32 *N. J. Super.* 443 (*App. Div.* 1954); *Richard v. Falleti*, 13 *N. J. Super.* 534 (*App. Div.* 1951); *Lippincott v. Content*, 123 *N. J. L.* 277 (*E. & A.* 1939); *Feist & Feist, Inc. v. Taub*, 105 *N. J. L.* 237 (*E. & A.* 1928); *Freeman v.*

*Van Wagenen,* 90 *N. J. L.* 358 *(Sup. Ct.* 1917); *Rauchwanger v. Katzin,* 82 *N. J. L.* 339 *(Sup. Ct.* 1912).

Manifestly, "able" in the context of the rule meant more than mere mental competence to make a contract or physical ability to sign it. But no discussion of the subject is to be found in the early New Jersey cases—probably because it was so plain that financial capacity was the primary ingredient of the word. 12 *C. J. S. Brokers* § 85 (1938); 12 *Am. Jur. 2d, Brokers* § 184 (1964). Nevertheless, the opinions appear to have given no consideration to the matter of the buyer's financial ability to complete the transaction by paying the agreed price and taking title to the premises. Nothing was said specifically as to whether it was any part of the broker's obligation to present a financially capable buyer, or whether he had any duty to make such an inquiry of the buyer. Nor was it said that by producing the buyer the broker impliedly represented that he was able, in the financial sense, to perform.

Other jurisdictions left no doubt that "able" referred to the financial ability of the broker-produced purchaser to complete the transaction. In cases where the broker sued the owner for commission because of an alleged unreasonable refusal *to enter into a contract of sale* with the proffered willing and able customer, it was held that as a condition precedent to recovery, the broker was required to establish that his customer was financially able not only to make the initial payment required on execution of the contract, but also to have available the requisite funds to complete the undertaking at the time fixed for performance. *Morere v. Dixon Real Estate Co.,* 188 *So. 2d* 623, 627 *(La. App.* 1966); *Gartner v. Higgins,* 214 *A. 2d* 849 *(R. I.* 1965); *DeHarpport v. Green,* 215 *Or.* 281, 333 *P. 2d* 900, 902 (1959); *Korman v. Wanen Catalpa Apartments, Inc.,* 20 *Ill. App. 2d* 598, 156 *N. E. 2d* 621 (1959); *Globerman v. Lederer,* 281 *App. Div.* 39, 117 *N. Y. S. 2d* 549 (1952); *Kaiser v. Shannon,* 120 *Ind. App.* 140, 90 *N. E. 2d* 819 (1950); *Suhre v. Busch,* 343 *Mo.* 170, 120 *S. W. 2d* 47

(1938); *Abbott v. Floyd,* 136 *Cal. App.* 365, 28 *P. 2d* 929 (1934); *Campbell v. Hood,* 35 *S. W. 2d* 93, 85 *A. L. R.* 266 (*Comm. of App. of Texas* 1931); *Ebling v. Brewer,* 154 *Md.* 290, 141 *A.* 363, 366 (1928); *Pellaton v. Brunski,* 69 *Cal. App.* 301, 231 *P.* 583 (1924); *Reynor v. Mackrill,* 181 *Iowa* 210, 164 *N. W.* 335, 1 *A. L. R.* 523 (1917); *Butler v. Baker,* 17 *R. I.* 582, 23 *A.* 1019 (1892); 12 *Am. Jur. 2d, Brokers* § 184 (1964); *Annotation,* 1 *A. L. R.* 528 (1919).

The early cases in our State implicitly imposed on the owner the burden of inquiry or investigation of the financial ability of the person produced as a prospective buyer. They said that if the owner accepted the purchaser brought by the broker and executed a contract to sell to him, that ended the matter as far as the broker's right to commission was concerned. For example, in *Courter v. Lydecker,* 71 *N. J. L.* 511, 513 (*Sup. Ct.* 1904), where the purchaser defaulted and title did not pass, the court held the owner liable for commission, saying:

"In the present case the broker obtained a purchaser willing to conclude a bargain upon the terms upon which the broker was authorized to sell, *who was acceptable to—for he was accepted by*—the vendor." (Emphasis ours.)

Likewise in *Freeman v. Van Wagenen, supra,* after referring to the rule that the broker's burden was "no more than to negotiate a sale by finding a purchaser upon satisfactory terms" the Supreme Court said: "This the plaintiff did, the defendants actually accepted Scherer as satisfactory." 90 *N. J. L.,* at *p.* 361.

Later, more unqualified statements began to appear with respect to the effect on the broker's commission claim of the buyer's inability to complete the contract. It was declared that if the broker in good faith produces a prospective purchaser who is accepted by the seller, and a contract of sale made between the two, the purchaser's ability to perform was no longer open to question. To illus-

trate, in *Matz v. Bessman,* 1 *N. J. Misc.* 5 (*Sup. Ct.* 1923), the broker produced a buyer who, the court said, was "plainly satisfactory" because the owner contracted with him. When it developed that the buyer was financially unable to take title, the owner was held responsible for commission because he had "accepted" the buyer, and "the broker was not an insurer of either the solvency or the willingness of the customer."

In *Brindley v. Brook,* 10 *N. J. Misc.* 612 (*Sup. Ct.* 1932) it was said that by contracting with the purchaser presented by the broker, the owner accepted him as satisfactory, and whether the purchaser was able ultimately to comply with the terms of the agreement "was of no concern" to the broker. He had earned his commission. Thereafter a series of cases projected the rule that once the seller accepted a buyer by entering into a contract of sale, he must be considered to have accepted the financial ability of the buyer to perform, and the broker, who acted in good faith, was entitled to his commission even though the buyer eventually proved to be financially unable to perform; it is immaterial whose fault it was that the final settlement did not take place. *Hatch v. Dayton,* 130 *N. J. L.* 425 (*Sup. Ct.* 1943); *Richard v. Falleti, supra; Winter v. Toldt, supra; Hedden v. Folio, supra.*

In order to complete the portrayal of the evolution of the current state of the law respecting the right of the real estate broker to commission, it must be noted that all of the cases from *Hinds v. Henry* through *Blau v. Friedman* recognize that by the use of appropriate language the owner-seller, in engaging the broker, may make his liability for commission depend specifically upon the closing of title and receipt by the seller of the consideration. The effectiveness and practicability of this as a safeguard measure for the property owner will be discussed hereafter.

We pause at this point to explain that a primary reason for granting certification in this case was to re-evaluate the justice and propriety of continuing the legal principles out-

lined above. Is it just to permit a broker to recover commission from an owner simply because he entered into a contract on mutually agreeable terms with a buyer produced by the broker, when it later develops that the buyer cannot or will not complete the transaction by closing the title? We do not think so.

A new and more realistic approach to the problem is necessary.

There can be no doubt that ordinarily when an owner of property lists it with a broker for sale, his expectation is that the money for the payment of commission will come out of the proceeds of the sale. He expects that if the broker produces a buyer to whom the owner's terms of sale are satisfactory, and a contract embodying those terms is executed, the buyer will perform, *i. e.* he will pay the consideration and accept the deed at the time agreed upon. Considering the realties of the relationship created between owner and broker, that expectation of the owner is a reasonable one, and, in our view, entirely consistent with what should be the expectation of a conscientious broker as to the kind of ready, willing and able purchaser his engagement calls upon him to tender to the owner.

The present New Jersey rule as exemplified by the cases cited above is deficient as an instrument of justice. It permits a broker to satisfy his obligation to the owner simply by tendering a human being who is physically and mentally capable of agreeing to buy the property on mutually satisfactory terms, so long as the owner enters into a sale contract with such person. The implication of the rule is that the owner has the burden of satisfying himself as to the prospective purchaser's ability, financial or otherwise, to complete the transaction; he cannot rely at all on the fact that the purchaser was produced in good faith by the broker as a person willing and able to buy the property. Once he enters into a contract of sale with the broker's customer, he is considered to have accepted the purchaser as fully capable of the ultimate performance agreed upon. If it later appears that

the purchaser is not financially able to close the title, or even that he never did have the means to do so, the owner must pay the broker his commission, so long as he acted in good faith. Such a rule, considered in the context of the real relationship between broker and owner, empties the word "able" of substantially all of its significant content and imposes an unjust burden on vendors of property. It seems to us that fairness requires that the arrangement between broker and owner be interpreted to mean that the owner hires the broker with the expectation of becoming liable for a commission only in the event a sale of the property is consummated, unless the title does not pass because of the owner's improper or frustrating conduct.

The principle that binds the seller to pay commission if he signs a contract of sale with the broker's customer, regardless of the customer's financial ability, puts the burden on the wrong shoulders. Since the broker's duty to the owner is to produce a prospective buyer who is financially able to pay the purchase price and take title, a right in the owner to assume such capacity when the broker presents his purchaser ought to be recognized. It follows that the obligation to inquire into the prospect's financial status and to establish his adequacy to fulfill the monetary conditions of the purchase must be regarded logically and sensibly as resting with the broker. Thus when the broker produces his customer, it is only reasonable to hold that the owner may accept him without being obliged to make an independent inquiry into his financial capacity. That right ought not to be taken away from him, nor should he be estopped to assert it, simply because he "accepted" the buyer, i. e., agreed to convey to him if and when he paid the purchase price according to the terms of the contract. In reason and in justice it must be said that the duty to produce a purchaser able in the financial sense to complete the purchase at the time fixed is an incident of the broker's business; so too, with regard to any other material condition of the agreement to purchase which is to be performed at the closing. In a practical world, the true

test of a willing buyer is not met when he signs an agreement to purchase; it is demonstrated at the time of closing of title, and if he unjustifiably refuses or is unable financially to perform *then,* the broker has not produced a willing buyer.

A lucid and realistic explanation of the relationship between an intending vendor of real property and the broker appears in the opinion of Denning, L. J. in *Dennis Reed, Ltd. v. Goody,* [1950] 2 *K. B.* 277, *pp.* 284–285, 1 *All Eng. Rep.* (1950) 919, 923:

"When a house owner puts his house into the hands of an estate agent, the ordinary understanding is that the agent is only to receive a commission if he succeeds in effecting a sale; but if not, he is entitled to nothing. That has been well understood for the last 100 years or more. * * * The agent in practice takes what is a business risk: he takes on himself the expense of preparing particulars and advertising the property in return for the substantial remuneration—reckoned by a percentage of the price—which he will receive if he succeeds in finding a purchaser. * * *

No particular words are needed to create the relationship. All the familiar expressions 'please find a purchaser,' 'find someone to buy my house', 'sell my house for me', and so on, mean the same thing: they mean that the agent is employed on the usual terms; but none of them give any precise guide as to what is the event on which the agent is to be paid. The common understanding of men is, however, that the agent's commission is payable out of the purchase price. The services rendered by the agent may be merely an introduction. He is entitled to commission if his introduction is the efficient cause in bringing about the sale. * * * But that does not mean that commission is payable at the moment of the introduction: it is only payable on completion of the sale. The house-owner wants to find a man who will actually buy his house and pay for it. He does not want a man who will only make an offer or sign a contract. He wants a purchaser 'able to purchase and able to complete as well' [citing cases].

Some confusion has arisen because of the undoubted fact that, once there is a binding contract for sale, the vendor cannot withdraw from it except at the risk of having to pay the agent his commission. This has led some people to suppose that commission is payable as soon as a contract is signed: and I said so myself in *McCallum v. Hicks,* [(1950) 2 *K. B.* 277, 1 *All Eng. Rep.* [1950] 864].

But this is not correct. The reason why the vendor is liable in such a case is because, once he repudiates the contract, the purchaser is no longer bound to do any more towards completion: and the vendor cannot rely on the non-completion in order to avoid payment of

commission, for it is due to his own fault.  *  *  *  [citing cases]. But if the vendor could show that the purchaser would not in any event have been able or willing to complete, he would not be liable for commission  *  *  *. When it is not the vendor, but the purchaser, who withdraws, the case is entirely different; for, even though a binding contract has been made, nevertheless, if the purchaser is unable or unwilling to complete, the agent is not entitled to his commission."

See also, 1 *Halsbury's Laws of England* (3d *Ed.* 1952), *Agency* ¶ 457 p. 198; *Boisseau v. Vallon & Jordano,* 174 *La.* 492, 141 *So.* 38 (1932).

. The rule expressed above became the law of Maryland in 1852. *Keener v. Harrod,* 2 *Md.* 63, 56 *Am. Dec.* 706 (1852). In *Riggs v. Turnbull,* 105 *Md.* 135, 66 *A.* 13, 8 *L. R. A., N. S.,* 824 (1907), where the broker-produced buyer did not have the financial means to perform the contract, the claim for commission was rejected. The Court of Appeals declared that the legal import of an agreement to produce a purchaser binds the party to present a person who ultimately buys the property. Mere execution of the contract to purchase is not sufficient. He must actually purchase by complying with the terms agreed on, unless his failure to do so is occasioned by the fault of the vendor. 66 *A.,* at *pp.* 14–15. But see *Coppage v. Howard,* 127 *Md.* 512, 96 *A.* 642, 645 (1916).

The Supreme Court of Rhode Island has taken substantially the same position as the Maryland Court of Appeals. In *Butler v. Baker, supra,* the court said:

"That question is whether it is enough to entitle a broker to his commission that he has produced a person as a purchaser of an estate who is ready and willing to purchase upon the seller's terms, and a contract has been entered into to that effect between the seller and the person produced; or whether it must also appear that the person produced is of sufficient pecuniary ability to make the purchase. The plaintiff contends that the signing of the receipt setting forth the terms of the contract of sale was an acceptance of Bronson as a purchaser, and that he thereby became entitled to his commission, his contract having then been completed, without reference to Bronson's ability to perform the contract of purchase. We do not assent

to this position. The production of a person as a purchaser was an implied representation by the plaintiff to the defendant that Bronson was able financially, as well as ready and willing to purchase." 23 *Atl.*, at *p.* 1019.

■ Study of the problems involved in this case in light of the above considerations leads us to the following conclusions as to what the controlling rule should be in New Jersey: When a broker is engaged by an owner of property to find a purchaser for it, the broker earns his commission when (a) he produces a purchaser ready, willing and able to buy on the terms fixed by the owner, (b) the purchaser enters into a binding contract with the owner to do so, and (c) the purchaser completes the transaction by closing the title in accordance with the provisions of the contract. If the contract is not consummated because of lack of financial ability of the buyer to perform or because of any other default of his, (*Campbell v. Hood, supra*), there is no right to commission against the seller. On the other hand, if the failure of completion of the contract results from the wrongful act or interference of the seller, the broker's claim is valid and must be paid. In short, in the absence of default by the seller, the broker's right to commission against the seller comes into existence only when his buyer performs in accordance with the contract of sale.

■■ We reject the proposition that whenever the owner-seller enters into a binding sale contract with the proffered customer, the broker's right to commission is complete unless the owner has made a special agreement with the broker that such right is contingent upon the closing of title. The basic law governing the owner-broker relationship is declared to be that absent default by the owner, the contract of sale must be performed by the buyer before liability for commission is imposed upon the owner. Execution of a contract to sell to the tendered purchaser, without more, will not bar the owner from relying upon the financial or other inability or failure of the buyer to complete his undertaking as an absolute defense to the broker's suit. It is our view and we so

hold that in entering into the contract of sale the owner is entitled to assume that the customer is, or will be at the time fixed for closing, financially able to meet the terms of sale, and that he is now and will be at performance time willing to complete the transaction. Further we hold that even if both broker and seller, on execution of the contract of sale, in good faith believe the buyer to be financially able to perform, and it turns out otherwise at the crucial time, the seller cannot be held for commission. What must be regarded as the fundamental intendment of the parties, owner and broker, *i. e.*, that the owner will sell and the buyer will pay, and the broker will thus earn his commission out of the proceeds, cannot be ignored in this connection. This uncomplicated reality should not be complicated by controversies over who knew what with respect to the buyer's financial capacity to close the title. The risk of such inability at that crucial time must be treated as a normal incident of the brokerage business. In our view, these statements represent reasonable and just rules for determining the problems thus far discussed. Any cases in our reports inconsistent therewith, particularly those which hold that once an owner-seller makes a contract to sell his property to the broker's customer, the customer's financial ability to perform is no longer open to question, are overruled, and can no longer be considered the law of this State.

We come now to another aspect of the over-all problem. To what extent may the broker, by special contract, thwart the general rules now declared to control the usual relationship between him and an owner who engages him to find a purchaser? There can be no doubt that the business of the real estate broker is affected with a public interest. The Legislature has marked it off as distinct from occupations which are pursued of common right without regulation or restriction. *Tanenbaum v. Sylvan Builders, Inc.,* 29 *N. J.* 63, 74 (1959); *N. J. S. A.* 45:15–1 *et seq.* Moreover, subject to a qualification which need not be noted here, the lawmakers long ago amended the

statute of frauds so as to deny brokers the right to commission on a sale of real property unless their authority from the owner to find a purchaser is given in writing. *N. J. S. A.* 25:1–9. The statutes are a valid exercise of the police power designed as they are to protect the public from fraud, incompetence, misinterpretation, sharp or unconscionable practice. *Stahl v. Township of Teaneck,* 162 *F. Supp.* 661 (*D. C. N. J.* 1958); *N. J. S. A.* 45:15–17. Long before these enactments, the relationship between the broker and his principal was regarded as one affected by considerations of public policy. The broker was and is looked upon as a fiduciary and is required to exercise fidelity, good faith and primary devotion to the interests of his principal. *Wilcox v. Reynolds,* 169 *Okla.* 153, 36 *P. 2d* 488 (1934); *Haydock v. Stow,* 40 *N. Y.* 363 (1869). He cannot permit his interests to interfere with those of his principal. As the Court of Errors and Appeals said in *Young v. Hughes,* 32 *N. J. Eq.* 372, *pp.* 384–385 (*E. & A.* 1880), the rule which applies to trustees has been equally applied to the relation between the real estate broker and his principal. He must show perfect good faith and openness of dealing. The rule was not intended to be remedial of actual wrong done alone, but also to be preventive of the possibility of it. He cannot engage in any unconscionable conduct toward his principal in the matter of his commission. *McKelvy v. Milford,* 37 *So. 2d* 370 (*La. App.* 1948); and see generally, 12 *Am. Jur. 2d, Brokers* § 84 (1964).

Courts and legislatures have grown increasingly sensitive to imposition, conscious or otherwise, on members of the public by persons with whom they deal, who through experience, specialization, licensure, economic strength or position, or membership in associations created for their mutual benefit and education, have acquired such expertise or monopolistic or practical control in the business transaction involved as to give them an undue advantage. *Henningsen v. Bloomfield Motors, Inc.,* 32 *N. J.* 358, *pp.* 388–

391 (1960). Grossly unfair contractual obligations result-
ing from the use of such expertise or control by the one
possessing it, which result in assumption by the other con-
tracting party of a burden which is at odds with the
common understanding of the ordinary and untrained mem-
ber of the public, are considered unconscionable and there-
fore unenforceable. In the tremendous area of business
transactions covered by the Uniform Commercial Code, the
Legislature has ordained that

"\* \* \* If the court as a matter of law finds the contract or any
clause of the contract to have been unconscionable at the time it was
made the court may refuse to enforce the contract, or it may enforce
the remainder of the contract without the unconscionable clause, or it
may so limit the application of any unconscionable clause as to avoid
any unconscionable result." *N. J. S. A.* 12A :2–302.

The perimeter of public policy is an ever increasing one.
Although courts continue to recognize that persons should
not be unnecessarily restricted in their freedom to contract,
there is an increasing willingness to invalidate unconscion-
able contractual provisions which clearly tend to injure the
public in some way. *Henningsen v. Bloomfield Motors, Inc.,*
32 *N. J.,* at *pp.* 403–404; *Kuzmiak v. Brookchester, Inc.,*
33 *N. J. Super.* 575 (*App. Div.* 1955); *Reinhardt v.
Passaic-Clifton Nat'l Bank,* 16 *N. J. Super.* 430, *pp.* 435–
436 (*App. Div.* 1951); *Hodnick v. Fidelity Trust Co.,* 96
*Ind. App.* 342, 183 *N. E.* 488, 491 (1932).

The record in the present case contains samples of stan-
dardized printed forms of special agreements, used by brokers
and real estate boards, which are presented to intending
sellers for signature when a broker is retained. They are
designed to impose on the owner liability for commissions
immediately upon execution of a contract to sell to a cus-
tomer produced by the broker, irrespective of whether the
buyer proves unable financially or unwilling for some other
unjustifiable reason to complete the sale. Two examples
of such agreements are as follows:

"Commission or commissions shall be earned when the agreement of sale is executed by the buyer and seller, and both the agent and his cooperating broker are authorized to deduct all or part of their commissions from the initial deposit at the time of signing of the sales agreement, provided however, that the initial deposit shall be at least double the amount of the commissions deducted."

"The owner or owners of property or properties to be sold or exchanged hereunder hereby recognize(s)
as the broker negotiating this agreement of sale and hereby agree(s) to pay said broker, for services rendered, a commission as now established by the real estate board in whose territory the above property is situated, namely ..... % of the within-mentioned selling price; same to be paid upon the execution of this agreement. It is the intention of the parties hereto that this provision of this agreement is made for the benefit of said broker."

The rules which we have set down above to govern dealings, rights, and duties between brokers and owners are necessary for the protection of property owners, and constitute the public policy of our State. Whenever there is substantial inequality of bargaining power, position or advantage between the broker and the other party involved, any form of agreement designed to create liability on the part of the owner for commission upon the signing of a contract to sell to a prospective buyer, brought forward by the broker, even though consummation of the sale is frustrated by the inability or the unwillingness of the buyer to pay the purchase money and close the title, we regard as so contrary to the common understanding of men, and also so contrary to common fairness, as to require a court to condemn it as unconscionable. See *Mayfair Fabrics v. Henley,* 48 *N. J.* 483, 487 (1967).

In view of our holding here that a broker is not entitled to commission from the seller if title does not pass because of the inability or fault of the customer, and the further rule to be expounded hereafter respecting the liability of the buyer to the broker where the buyer is the defaulting party, in our judgment public policy requires the courts to read into every brokerage agreement or contract of sale a requirement that barring default by the seller, commissions

shall not be deemed earned against him unless the contract of sale is performed. By the same token, whenever the substantial inequality of bargaining power, position or advantage to which we have adverted appears, a provision to the contrary in an agreement prepared or presented or negotiated or procured by the broker shall be deemed inconsistent with public policy and unenforceable. Compare *McKelvy v. Milford, supra,* 37 *So. 2d,* at *p.* 373.

On the basis of all we have said above, and although we agree with the Appellate Division that the provision in the contract of sale between Dobbs and the Johnsons respecting the time when the commission could be considered earned is at the very least ambiguous (compare *Alnor Constr. Co. v. Herchet, supra*), we hold as a matter of law that title not having closed solely because of the financial incapactiy of Iarussi, the claim against the Johnsons for commission must fail.

### B.

Dobbs contends further that the Johnsons are liable because they enforced the contract of sale against Iarussi by obtaining a judgment for specific performance against him, and thereafter, on his failure to perform, exchanged releases with him and received certain benefits in settlement of their claim against him for breach of the contract. The trial court sustained the contention and held that regardless of the legal significance of the agreement to pay commission which appeared in the contract of sale, the Johnsons' acceptance of damages for Iarussi's breach estopped them from denying the broker's commission claim. The Appellate Division correctly disagreed with that view. 92 *N. J. Super.,* at *p.* 280.

No wrongful conduct of the Johnsons frustrated the closing of title. The failure resulted from Iarussi's financial inability to perform. Moreover, they had no duty to seek specific performance so that Dobbs could earn the commission. Their passive acquiescence in his admitted

default would not constitute a wrongful failure of performance. *Todiss v. Garruto,* 34 *N. J. Super.* 333 *(App. Div.* 1955); *Amies v. Wesnofske,* 255 *N. Y.* 156, 174 *N. E.* 436, 73 *A. L. R.* 918 (1931). The action for specific performance was instituted by Iarussi who had breached his contract to buy. In doing so he alleged financial capacity to perform. The Johnsons, who were at all times anxious to complete the transaction, naturally, in order to avoid the possibility of being branded the defaulters, counter-claimed for the same relief, requesting that the court order performance and fix a day for it. In such circumstances, surely the resulting order for performance would not constitute acceptance of the benefits of the contract by the Johnsons unless, on the date set in the order, Iarussi actually completed performance. But again he failed and for the same reason, inability to obtain financing.

When the Johnsons saw no hope of Iarussi's completing the sale, their act in terminating the matter by exchanging mutual releases, with the attendant conditions set out above, did not, and was not intended to amount to the equivalent of performance of the contract. In a situation where a broker's right to commission depends, as here, on the completion of the contract of sale by the buyer, and the latter fails or refuses to perform, the seller is under no duty to the broker to sue the buyer for damages or for specific performance. *Todiss v. Garruto, supra,* 34 *N. J. Super.,* at *p.* 339; *Annotation,* 74 *A. L. R.* 2d 437, 493 (1960); 12 *C. J. S. Brokers* § 95 (1938). It is generally held that he may accept the forfeiture by the buyer, retain the down payment, and not become liable thereby to pay the broker. *Amies v. Wesnofske, supra,* 174 *N. E.,* at *p.* 438; *Smith v. Bretschneider,* 97 *N. H.* 117, 81 *A.* 2d 843 (1951); *Campbell v. Swallow,* 50 *R. I.* 467, 149 *A.* 254 (1930); *Partee v. Crawford,* 173 *Miss.* 732, 163 *So.* 389 (1935), 12 *Am. Jur.* 2d, *Brokers* § 210 (1964). If, however, the seller sued the buyer for breach of the contract and recovered damages therefor; or if not content with

retaining the deposit, he demanded and received a substantial additional sum as damages, he must be considered to have received an award representing the benefit lost, or an agreed payment representing the equivalent of performance. *Haber v. Goldberg,* 92 *N. J. L.* 367 *(E. & A.* 1918). In such case, the seller is deemed to have accepted the benefit of the broker's services, and is liable for the commission.

The rule is otherwise, however, if the seller does not seek or obtain damages representing the substantial equivalent of performance by the buyer. When he passively accepts the fact of the buyer's inability or refusal to perform the contract of sale, and in good faith, in order to bring the matter to an end, receives in return for the exchange of releases what in fairness can only be regarded as salvage as distinguished from the substantial equivalent of performance, in justice and in equity he should not be held to have incurred thereby any liability to the broker. *Todiss v. Garruto, supra,* 34 *N. J. Super.,* at *p.* 342. The Appellate Division so held here, and its decision is eminently sound. 92 *N. J. Super.,* at *p.* 281.

## III

### LIABILITY OF THE BUYER TO THE BROKER.

We regard it as a matter of common knowledge that the ordinary prospective purchaser knows when he consults a broker that if he buys a property through the efforts of the broker, customarily the broker will earn a commission on the sale to be paid by the owner-seller out of the purchase price. As the Chief Justice noted in *Harris v. Perl,* 41 *N. J.* 455, 462 (1964), "the economic facts and the expectations of fair men with respect to real estate brokerage are clear enough. The role of the broker is to bring buyer and seller together at terms agreeable to both, and both know the broker expects to earn a commission from

the seller if he succeeds." What, then, should be the responsibility of the buyer to the broker when, through the broker's efforts in negotiations between the parties, the owner (a) expresses his willingness to accept the buyer's offered price for the property, or (b) executes a written contract of sale with the buyer for the agreed price, providing that the broker's commission is to be paid upon closing of title?

This Court has held that when a prospective buyer solicits a broker to find or to show him property which he might be interested in buying, and the broker finds property satisfactory to him which the owner agrees to sell at the price offered, and the buyer knows the broker will earn commission for the sale from the owner, the law will imply a promise on the part of the buyer to complete the transaction with the owner. If he fails or refuses to do so without valid reason, and thus prevents the broker from earning the commission from the owner, he becomes liable to the broker for breach of the implied promise. The damages chargeable to him will be measured by the amount of commission the broker would have earned from the owner. If no amount or percentage had been agreed upon, recovery will be based on *quantum meruit* and measured by the amount accepted as reasonable according to the usual custom in such brokerage business. *Tanner Associates, Inc. v. Ciraldo*, 33 *N. J.* 51, *pp.* 67–68 (1960).

It is true that *Tanner* involved a prospective buyer who was looking for land to be used for residential development, and the solicitation of the broker's services was in furtherance of that intention. But the language of the Court does not indicate that imposition of an implied promise to perform if the broker found land on agreeable terms, so as to enable the broker to earn commission from the owner, is limited to such a factual setting. A broader view of the principle established there finds support in the texts. For example, in 12 *C. J. S. Brokers* § 82 (1938) it is stated:

"[W]here a broker is employed by the owner of property to sell the same, the purchaser is not liable for the broker's commissions, unless he has agreed to pay them or is liable therefor by way of damages for failing or refusing to carry out his contract, or for some other wrongful act or omission which interferes with the broker's right to recover commissions from his principal."

Moreover, there is substantial authority elsewhere to the effect that a real estate broker may sue a purchaser who refuses to carry out his contract with the vendor, even though the broker has agreed to look to the vendor for his commission. *Blache v. Goodier,* 22 *So. 2d* 82 (*La. App.* 1945); *Probst v. Di Giovanni,* 232 *La.* 811, 95 *So. 2d* 321 (1957); *Danciger Oil & Ref. Co. v. Wayman,* 169 *Okl.* 534, 37 *P. 2d* 976, 97 *A. L. R.* 854 (1934); *Grossman v. Herman,* 266 *N. Y.* 249, 194 *N. E.* 694, 695 (1935); *Livermore v. Crane,* 26 *Wash.* 529, 67 *P.* 221, 57 *L. R. A.* 401 (1901).

In *Blache v. Goodier, supra,* the Court of Appeal of Louisiana said this on the subject:

"It is settled that * * * the [broker's] commission is due by the prospective purchaser if, after binding himself, he refuses to comply with his agreement." 22 *So. 2d,* at *pp.* 85–86.

In discussing the same type of case, the Supreme Court of Washington, in *Livermore v. Crane, supra,* regarded as immaterial the question whether in the original negotiation on the sale the broker was the agent of the vendor or the purchaser. It said the cause of action was for violation of the contract to purchase, from which violation damages directly resulted to the broker. 67 *P.,* at *p.* 222. In this connection, it may be noted that in *Treadaway v. Piazza,* 156 *So. 2d* 328, 329 (*La. App.* 1963) the court declared that when a prospective vendor engages the services of a real estate broker, the legal relationship is that of principal and agent. But once the broker finds a prospective vendee, he becomes an agent of both parties.

We accept the broad view of the purchaser's liability suggested by these authorities, and find no conflict between it and the holding of this Court in *Tanner*. As set forth above, Iarussi requested Dobbs to find land suitable for residential development, which could be bought by him on agreeable terms. When the Johnsons' acreage was shown to him and he contracted to buy it, he knew they had agreed to pay commission to Dobbs upon sale. Under the circumstances, the *Tanner* rule is clearly applicable and Iarussi became subject to an implied obligation to Dobbs to complete the purchase, and upon default in completion he became liable to pay the commission which Dobbs was thereby deprived of from the Johnsons. See also, *Duross Co. v. Evans*, 22 *A. D. 2d* 573, 257 *N. Y. S. 2d* 674 (1965); *Brawner v. Cumbie*, 264 *S. W.* 497 (*Tex. Civ. App.* 1924); *McKnight v. McGuire*, 117 *Misc.* 306, 191 *N. Y. S.* 323 (1921); *James v. Home of the Sons & Daughters of Israel*, 153 *N. Y. S.* 169 (*Sup. Ct. App. Term* 1915); *Eells Bros. v. Parsons*, 132 *Iowa* 543, 109 *N. W.* 1098 (1906).

Iarussi claims that Dobbs' representative, Fleming, was fully aware of his financial condition. This knowledge arose from the previous course of dealings between them, and more specifically from his financial inability to complete the first attempt to buy the Johnsons' property. His testimony, and that of the Johnsons (which was unduly restricted at the trial), is to the effect that when the contract of sale, which is the subject of this suit, was executed, Fleming knew Iarussi's performance depended upon his acquisition of financial backing before the closing; he knew also that the closing itself and his right to commission were so conditioned. On the other hand, Fleming denies knowledge that Iarussi's performance of the contract was contingent upon securing financing. He denies also that he understood or agreed that his commission was subject to Iarussi's success in obtaining financing before the closing date. This factual controversy can only be resolved by a jury.

Under all the circumstances we hold that the Appellate Division erred in finding that Dobbs had no cause of action against Iarussi as a matter of law and in directing entry of judgment in favor of Iarussi. In our judgment, there is a jury question as to the nature of the relationship between Dobbs and Iarussi. A jury should also decide whether Dobbs (through Fleming) knew and agreed, expressly or impliedly, that performance was subject to the financing contingency and that commission would be earned only on satisfaction of that contingency. If the jury finds in favor of Iarussi on this issue, Dobbs is not entitled to recover.

## IV

For the reasons outlined, the judgment against the Johnsons in the trial court, as well as the reversal of that judgment by the Appellate Division and the ordering of a new trial are reversed, and judgment is entered in their favor and against the plaintiff Dobbs.

Further, the judgment in the trial court against Iarussi, as well as that of the Appellate Division directing entry of judgment in his favor as a matter of law, are reversed, and the cause is remanded for a new trial against Iarussi on the theory explained herein.

We have examined other incidental questions raised by the parties, but have found nothing which affects the substantial merits of the controversy sufficiently to require discussion.

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, SCHETTINO and HANEMAN—6.

*For affirmance*—None.