**In re WHEELING–PITTSBURGH STEEL CORPORATION, et al., Debtors.**

**Bankruptcy No. 85–793 PGH.**

United States Bankruptcy Court, W.D. Pennsylvania.

March 19, 1986.

See also 54 B.R. 772.

Dennis S. Shilobod, and Thomas M. Zwilling, Strassburger McKenna, Pittsburgh, Pa., for H. Yale Gutnick, Receiver of Harmar Coal Co.

M. Bruce McCullough, and Gary Philip Nelson, Buchanan Ingersoll, Pittsburgh, Pa., and Gary J. Gaertner, William M. Hoffman, and B.A. Karlowitz, Berkman, Ruslander, Pohl, Lieber & Engel, Pittsburgh, Pa., for Wheeling-Pittsburgh Steel Corp., et al, Debtors.

MEMORANDUM OPINION AND ORDER ON MOTION OF H. YALE GUTNICK FOR PAYMENT OF OPERATING EXPENSES AND OTHER LIABILITIES

WARREN W. BENTZ, Bankruptcy Judge.

### Case Summary

Wheeling-Pittsburgh Steel Corporation ("Wheeling-Pittsburgh") filed a petition for relief under Chapter 11 of the Bankruptcy Code ("Code") on April 16, 1985. On May 22, 1985, H. Yale Gutnick, Receiver [1] of the Harmar Coal Company ("Receiver"), filed a motion to compel Wheeling-Pittsburgh to pay, as costs of administration, certain expenses relating to the maintenance of the Harmar Coal Mine. In response, Wheeling-Pittsburgh filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and Bankruptcy Rule 7012. For the reasons discussed below,[2] the court finds that the Receiver's Statement of Facts, when viewed in the light most favorable to the Receiver, fails to support an administrative claim against Wheeling-Pittsburgh for the costs of maintaining the Harmar Coal Mine.

### Jurisdiction

This court has jurisdiction over the parties and subject matter of this action under 28 U.S.C. § 1334 and the General Order of Reference of the United States District Court for the Western District of Pennsylvania dated October 16, 1984 entered pursuant to 28 U.S.C. § 157. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (B).

### Procedural Posture

The procedural posture of this proceeding was shaped by an agreement between the parties. Pursuant to this agreement, the Receiver submitted a statement of facts ("Statement of Facts"), in addition to his motion, which he believes the trier of fact could find after a fact-finding hearing. Wheeling-Pittsburgh then filed its Rule 12(b)(6) motion demurring to those facts, and the parties submitted briefs and memoranda of law.[3]

In ruling on a typical motion to dismiss for failure to state a claim upon which relief can be granted, the bankruptcy court must view the facts in a manner most favorable to the plaintiff, and grant such a motion "only if it appears certain that the plaintiff is entitled to no relief under any statement of facts which could be proved in support of the claim." *In re Cresta,* 40 B.R. 953, 954 N. 1 (Bankr.E.D.Pa.1984), *citing, Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), *citing, Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Due to the procedural posture effectuated by the

---

**1.** On or about May 3, 1985, H. Yale Gutnick, Esq. was appointed Receiver of Harmar Coal Company by the Court of Common Pleas, Allegheny County, Pennsylvania.

**2.** This Memorandum Opinion constitutes this court's findings of fact and conclusions of law as required by Bankruptcy Rule 7052 as made applicable to this contested matter by Bankruptcy Rule 9014.

**3.** A rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted must be made before service of a responsive pleading. Fed.R.Civ.P. 12(b). Here, the debtor filed a responsive pleading to the Receiver's motion. However, we still may consider the motion which is technically no longer a 12(b)(6). *See In re Cresta,* 40 B.R. 953, 954 (Bankr.E.D.Pa.1984) (citations omitted).

parties' agreement, the relevant focus is not on "any statement of facts which could be proved," as would be the case with a typical 12(b)(6) motion. Rather, the relevant focus is on the particular Statement of Facts submitted by the Receiver. Therefore, the central issue is whether the Receiver's Statement of Facts, when viewed in the light most favorable to the Receiver, supports an allowable administrative claim against Wheeling-Pittsburgh for the costs of maintaining the Harmar Coal Mine.

### Background

In June of 1952, the predecessors of both Wheeling-Pittsburgh and Consolidation Coal Company ("Consol") together with Consumers Mining Company ("Consumers")[4] entered into an agreement for the formation of the Harmar Coal Company ("Harmar"). At the time of its incorporation, Harmar entered into various agreements with Wheeling-Pittsburgh, Consol and Consumers. Among these agreements were (1) a coal output contract between Harmar and Wheeling-Pittsburgh dated June 30, 1952, and the December 21, 1978 amendment thereto, pursuant to which Harmar agreed to sell its coal to Wheeling-Pittsburgh; (2) a deed dated June 30, 1952 from Consumers to Harmar which conveyed thirty-one parcels of real estate; (3) a lease of coal properties dated June 30, 1952 between Consol and Consumers, as lessors, and Harmar, as lessee; (4) a supplement dated September 24, 1963 to the June 30, 1952 lease; and (5) a management agreement dated June 30, 1952 between Consol and Harmar, whereby Consol agreed to act as manager of Harmar. The Receiver relies on language contained in these agreements, as well as on an alleged prepetition oral standby agreement of May, 1980 between Wheeling-Pittsburgh and Harmar (which suspended mining operations at the Harmar Mine), to substantiate Harmar's administrative claim.

Without delving too deeply into the hydrogeological details of the problem, it appears as though immediate and costly measures must be taken to maintain the Harmar Coal Mine in compliance with Pennsylvania environmental laws, particularly the Pennsylvania Clean Streams Law. Pa.Stat. Ann. tit. 35 § 691.1 *et seq.* (Purdon and Supp.1985). Currently, untreated acid mine water is building up in the Indianola Mine, which is located adjacent to and uphill from the Harmar Mine. The Pennsylvania Department of Environmental Resources, after extensive litigation, required Harmar to treat the water pumped from the Indianola Mine. Unless the acid water in the Indianola Mine is pumped and treated, contaminated water will drain from the Indianola Mine down into the Harmar Mine shaft which will fill and overflow. This will result in the Harmar Mine discharging untreated acid water into lakes, streams, and eventually into an industrial park, in violation of state environmental laws. The Receiver estimates that millions of dollars are necessary to remedy this problem; however, Harmar is insolvent.

### Discussion

The Receiver's claim is grounded on language contained in one or more of the six agreements outlined above. In essence, then, the Receiver's claim is based on a consensual contract theory. That being the case, this court can conceive of two contractual theories in a bankruptcy context which would support the Receiver's claim that Wheeling-Pittsburgh must maintain the Harmar Mine as a cost of administering its estate. The first is that Wheeling-Pittsburgh assumed the cleanup obligation in a postpetition contract. The second theory is that Wheeling-Pittsburgh assumed the obligation in a prepetition executory contract which is not entitled to court approval for rejection and thus must be

4. Consumers Mining Company is a wholly-owned subsidiary of Wheeling-Pittsburgh. Consumers and six other subsidiaries of Wheeling-Pittsburgh filed for relief under Chapter 11 of the Bankruptcy Code on April 16, 1985 and their cases are being administered together with Wheeling-Pittsburgh's case for convenience. Wheeling-Pittsburgh owns 75% of the stock of Consumers. Consol owns the remaining 25%.

assumed as a cost of administering the debtor's estate. *See In re Coast Trading Co., Inc.*, 744 F.2d 686, 688 (9th Cir.1984) ("obligations under contracts which are executory at the time of bankruptcy is filed are payable as an administrative expense priority when the executory contract has been assumed..."). In addition to his consensual contract theory, the Receiver argues that Wheeling-Pittsburgh is liable now for the costs of maintaining the Harmar Mine because Wheeling-Pittsburgh must necessarily assume ownership of the Harmar Mine property in the future. Each of these theories will be explored in turn.

### I. Ownership Theory

■ Harmar argues that Wheeling-Pittsburgh must assume the costs of maintaining the Harmar Mine now because Wheeling-Pittsburgh necessarily will be the owner of the Harmar Mine in the future. In forging this ownership theory, the Receiver relies on language found in the September 24, 1963 Supplement to the June 30, 1952 Lease Agreement between Consol and Consumers, as Lessors, and Harmar, as Lessee. This language provides that:

> Upon cancellation of all agreements between Consol, Consumers, Wheeling[-Pittsburgh] and Harmar relating to the formation or operation of Harmar, the parties will execute all necessary instruments to vest title to all coal, surface tracts or mined out areas not conveyed to third parties prior to or as a part of liquidation [in the parties who held such title immediately before Harmar did].

Prior to the formation of Harmar, Consumers held title to the Harmar Mine and therefore could, according to the quoted provision, reacquire the Harmar Mine in the future. Consumers is a wholly-owned subsidiary of Wheeling-Pittsburgh and, according to the Receiver's allegations, is the "alter ego" of Wheeling-Pittsburgh. As Wheeling-Pittsburgh's alter ego, the Receiver reasons, Wheeling-Pittsburgh is responsible for Consumer's liabilities. The Receiver argues that since Consumers eventually will reacquire the Harmar Mine

and its attendant problems, Wheeling-Pittsburgh must assume the costs of cleanup now.

A close look at the problem reveals that the Receiver's initial premise (that Wheeling-Pittsburgh must eventually assume ownership of the Harmar Mine) is legally unsupportable for at least four independently fatal reasons. Consequently, the Receiver's conclusion that Wheeling-Pittsburgh must maintain the Harmar Mine as a cost of administration does not logically follow.

### A.

Initially, a plain reading of the quoted lease supplement language indicates that certain preconditions must be satisfied before title to the Harmar mine can be transferred back to Consumers. First, all agreements between Consol, Consumers, Wheeling-Pittsburgh and Harmar relating to the formation of Harmar must have been cancelled. Second, the parties must have executed all the necessary instruments to transfer title back to Consumers.

The Receiver's Statement of Facts does not allege that these preconditions have been satisfied. Without those facts, the Receiver cannot establish ownership in Consumers, and *a fortiori* under the Receiver's theory cannot establish ownership in Wheeling-Pittsburgh. These preconditions may never be satisfied in which case Consumers (and thus, Wheeling-Pittsburgh) will never reacquire the Harmar Mine.

Even if the preconditions are satisfied, it is still unclear whether Consumers must assume ownership of the Harmar mine or whether it may decline. The Receiver argues that the language "the parties will execute all necessary instruments to vest title ..." means that Consumers *must* accept title. The Debtor, on the other hand, interprets this language to mean that Consumers may, but is not required to, accept title. But regardless of the outcome on that issue, the Receiver's Statement of Facts still fails to allege that all of the preconditions have been satisfied, and in

this respect fails to state facts necessary to support a claim upon which relief can be granted. *See Sutton v. Eastern Viavi Co.*, 138 F.2d 959, 960 (7th Cir.1943) ("No claim for relief is stated if the complaint pleads facts insufficient to show that a legal wrong has been committed, or omits an averment necessary to establish the wrong, or fails to so link the parties with the wrong, so as to entitle the plaintiff to redress.").

Even if we were to overlook the omissions of facts necessary to support the Receiver's ownership theory and assume that the Receiver could allege and prove these facts at a trial, this still would not sufficiently state a claim upon which relief can be granted. This is true because, as we discuss in part D. of this opinion, regardless of whether Wheeling-Pittsburgh may be said to own the Harmar Mine, Harmar Coal Company expressly agreed in writing to maintain the Harmar Mine. Moreover, Harmar expressly agreed in writing to indemnify Consumers against and hold it harmless from all liability arising from the condition or use of the Harmar Mine.

### B.

A second defect exists in Harmar's ownership theory. In fashioning its ownership theory, Harmar does not rely on a deed. Instead, Harmar relies on language contained in the Supplement to the June 30, 1952 Lease Agreement to establish an ownership interest in Wheeling-Pittsburgh. However, the Lease Agreement, as supplemented, is a prepetition unexpired lease. Therefore, even if it could be shown that the Lease Agreement imposes liability for the costs of cleanup on Consumers (and under the Receiver's theory, on Wheeling-Pittsburgh), the debtor, with court approval, can reject this lease. In the event of rejection, Harmar would be left with a prepetition general unsecured claim, which is far short of the administrative priority relief to which it now claims it is entitled. *See* 11 U.S.C. § 365(g)(1) ["the rejection of an ... unexpired lease of the debtor consti-

tutes a breach of such ... lease ... immediately before the date of the filing of the petition;"].

### C.

A third defect exists in Harmar's ownership theory. The final paragraph in the September 24, 1963 Supplement to the June 30, 1952 Lease Agreement, which appears immediately after the "upon cancellation" paragraph reproduced on page 7 of this opinion, provides that:

> *Notwithstanding the foregoing,* upon the cancellation of all such agreements, it is agreed that *title to all unmined coal subject to the Harmar Lease* not in excess of the additional tonnage added hereby *shall vest in Consol* together with all mining rights and the right to purchase at fair market value surface tracts necessary for the efficient extraction thereof *and the parties shall execute such instruments* as may be necessary to effectuate this intent. (emphasis added)

Depending on the satisfaction of the conditions precedent and the resolution of the contract interpretation problems, both discussed in part A. above, it appears that Consol, not Consumers, will be the ultimate owner of the Harmar Mine. Therefore, *if* the preconditions are satisfied and *if* the proposed transferee of the property has no choice but to accept title, Consol, not Consumers, or Wheeling-Pittsburgh, will ultimately own the Harmar Mine.

### D.

Yet a fourth defect in the Receiver's ownership theory is disclosed by language in the original June 30, 1952 Lease Agreement. Language in that agreement indicates that ownership of the Harmar Mine actually is irrelevant to the issue of who, as between Harmar and Consumers, must maintain the Harmar Mine. In the June 30, 1952 Lease Agreement, Harmar expressly agreed to assume the costs of maintaining the Harmar Mine. Harmar further agreed to indemnify Consumers against and hold it harmless from all liability aris-

ing from the condition or use of the Harmar Mine.[5] Therefore, even if Consumers ultimately regained title to the Harmar mine and Wheeling-Pittsburgh were saddled with the cleanup costs on an alter ego theory, Wheeling-Pittsburgh would succeed to Consumers' indemnification and hold harmless defenses. The existence of these indemnification and hold harmless provisions necessarily defeat the Receiver's liability-by-ownership theory as it pertains to Consumers, and thus as it pertains to Wheeling-Pittsburgh. *See Josephson v. Joslin*, 38 F.R.D. 344, 345–46 (D.Ct.N.J. 1965) ("'A [complaint] may be dismissed on motion if clearly without any merit; and this want of merit may consist in an absence of law to support a claim of the sort made, or of facts sufficient to make a good claim, or in the disclosure of some fact which will necessarily defeat the claim.'") *quoting* 2a Moore's Federal Practice ¶ 12.-08 at p. 2271 (2nd Ed.1985); *See also Lavender v. United Mine Workers of America, 285 F.Supp. 869, 874 (D.Ct.Kansas 1968)* ("It is axiomatic that a complaint may be dismissed for failure to state a claim upon which relief can be granted if it be found to be 'clearly without any merit.' Such a deficiency may consist of an absence of law to support the claim or of the absence of facts sufficient to make a good claim or in the disclosure of facts which necessarily defeat the claim.") (dicta).

**5.** The relevant Lease Agreement language is as follows:

> Article VI
> Section 2. Lessee [Harmar] convenants and agrees that it will, at its *sole cost and expense, keep and maintain* all the leased premises and *the* Oakmont and *Harmar Mines,* including the haulage roads, mining plants, pumping plants, equipment, machinery, tools, mine cars, locomotives, appliances, houses and other buildings and all additions, replacements and improvements thereto located in or upon any part of the leased premises or said Oakmont and Harmar Mines, *in good repair and in proper operating condition, including maintenance of proper ventilation and drainage of the said Mines; and* that it *will from time to time make all such repairs, additions, replacements and improvements to said leased premises and to said Oakmont and Harmar Mines as shall be necessary to keep them in good operating condition;* (emphasis added)

### E.

■ Because neither Consumers nor Wheeling-Pittsburgh has a legal or equitable interest in the Harmar Coal Mine, the Harmar Coal Mine did not become property of the debtors' respective estates at the commencement of their bankruptcy cases. See 11 U.S.C. § 541. Accordingly, it is unnecessary to address the Receiver's argument that Wheeling-Pittsburgh may not abandon the Harmar Coal Mine in contravention of state environmental laws. *See In the Matter of Quanta Resources Corp.,* 739 F.2d 912 (3rd Cir.1984), *aff'd. sub nom., Midlantic Nat'l. Bank v. New Jersey Dept. of Envtl. Resources,* —— U.S. ——, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986).

### F.

Additionally, it is well to emphasize that we have not decided whether or not Wheeling-Pittsburgh is the "landowner" or "occupier" of the Harmar Mine for purposes of liability under the Pennsylvania Clean Streams Law. Pa.Stat.Ann. tit. 35 § 691.1 *et seq.* (Purdon and Supp.1985). Section 691.-316 of the Clean Streams Law enables the Pennsylvania Department of Environmental Resources to order a "landowner" or "occupier," as those terms are therein defined, to correct a condition on land in the Commonwealth which pollutes or presents

> Article IX
> Section 2. *Lessee* [Harmar] assumes the risk of the premises herein leased and any premises used incident thereto, and hereby releases and *covenants and agrees to protect, indemnify and save harmless Lessors [Consumers and Consol], and each of them, from and against all fines, penalties, loss, damages or expenses,* as well as *any actions, suits or claims at law, equity or otherwise,* which Lessors or either of them may directly or indirectly suffer, sustain, be subjected to or held liable for, by reason of injury (including death) to persons whomsoever or *damage to property, real or personal,* to whomsoever belonging, *growing out of, or arising in any manner or under any circumstances from, the condition of or use, occupancy or operation by Lessee of the premises leased herein,* or by reason of any breach, violation or nonperformance of any covenant or condition hereof on the part of Lessee. (emphasis added)

a potential threat of pollution. However, the Statement of Facts does not allege that the Harmar Mine property is currently in violation of the Clean Streams Law. Moreover, the Pennsylvania Department of Environmental Resources apparently has not yet cited Harmar for any environmental law violations. Therefore, the question of Wheeling-Pittsburgh's liability under the Clean Streams Law is not ripe for judicial determination, and in any event was not raised by any party.

## II. Non-Rejectable Prepetition Executory Contract or Unexpired Lease

■ The Receiver particularly relies on three agreements to fasten liability on Wheeling-Pittsburgh: (1) A coal output contract between Harmar and Wheeling-Pittsburgh dated June 30, 1952 and the December 21, 1978 amendment thereto; (2) an oral standby agreement of May 1980; and (3) the aforementioned June 30, 1952 lease between Harmar, Consumers and Consol, as supplemented on September 24, 1963. As is apparent from the respective dates of these agreements, they were all created prepetition. Curiously, though, the Receiver argues that these agreements are non-executory and therefore, not rejectable by Wheeling-Pittsburgh. This position, however, is fatal to the Receiver's claim for administrative priority. Assuming *arguendo* that one or more of these agreements imposes the cleanup obligation on Wheeling-Pittsburgh, *if,* as the Receiver argues, these truly are prepetition non-executory contracts *and if* Wheeling-Pittsburgh has breached its obligation to pay, the Receiver simply would be left with a prepetition general unsecured claim. If, however, these agreements are prepetition executory contracts or unexpired leases which are not entitled to court approval for rejection, Wheeling-Pittsburgh must assume these agreements, thereby assuming Harmar's maintenance costs as costs of administration. Therefore, in an effort to view the facts in the light most favorable to the Receiver, the court will proceed to analyze whether the facts, if proved, could support the existence of (1) a prepetition executory agreement or unexpired lease (2) which imposes the costs of cleanup on Wheeling-Pittsburgh (3) which is not entitled to court approval for rejection.

The court will assume *arguendo* in the light most favorable to the Receiver that the three agreements on which the Receiver relies are (1) prepetition executory contracts or unexpired leases which (2) contain language that imposes the costs of cleanup on Wheeling-Pittsburgh. The only issue, then, is whether the debtor is precluded by law from rejecting these agreements. If Wheeling-Pittsburgh is not so precluded but may reject these agreements under the applicable principles of law, then the Receiver's claim at best can rise only to the level of a prepetition unsecured claim. Under those circumstances, Wheeling-Pittsburgh's motion to dismiss must be granted.

■ At this point, it is appropriate to review the law relating to rejection of executory contracts and unexpired leases. The traditional test for determining whether the court should approve an application by the debtor to reject an executory contract is the "business judgment" test. *N.L.R.B. v. Bildisco and Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 1195, 79 L.Ed.2d 482 (1984); *In re Yellow Limousine Service, Inc.,* 22 B.R. 807, 808 (Bankr.E.D.Pa.1982). The business judgment test "simply [involves] a determination of whether rejection of the contract would benefit the estate." *Yellow Limousine,* 22 B.R. at 808. In the context of unexpired leases, it has been said that:

> A determination to permit rejection of an executory lease is based upon the benefit of the lease to the estate. Where the contract is detrimental and of little or no benefit to the estate, its rejection should be permitted ... Where the contract is burdensome and of no value to the continued operation of the debtor's business then it should be rejected in order to protect the creditors against unwarranted expenditures.

*In re Flying Airways, Inc.,* 328 F.Supp. 1256, 1257 (E.D.Pa.1971) (citations omitted).

"Since the decision is primarily an administrative, not a judicial matter, the business judgment of the debtor in possession or trustee is entitled to great deference by the court." *In re By-Rite Distributing, Inc.,* 47 B.R. 660, 668 N. 10 (Bankr.Utah 1985) (citations omitted). Again in the context of unexpired leases, it has been said that:

Court approval of a debtor in possession's judgment that assumption of a lease is in the best interest of the debtor's business should not be withheld on the basis of a second-guessing of the debtor's judgment, unless the matter is presented in the context of ... [determining] the larger question of the competency of debtor (sic) in possession's business judgment. As long as assumption of a lease appears to enhance a debtor's estate, Court approval of a debtor in possession's decision to assume the lease should only be withheld if the debtor's judgment is clearly erroneous, too speculative or contrary to the provisions of the Bankruptcy Code, and particularly of 11 U.S.C. § 365.

*Allied Technology, Inc. v. R.B. Brunneman & Sons,* 25 B.R. 484, 495 (Bankr.S.D. Ohio 1982).

An explanation is given in *In re Summit Land Co.,* 13 B.R. 310, 315 (Bankr.D.Utah 1981) for the great deference accorded by the court to the debtor's decision to reject:

[C]ourt approval under § 365(a), if required, except in extraordinary situations should be granted as a matter of course. To begin, this rule places responsibility for administering the estate with the trustee [or debtor in possession], not the court, and therefore furthers the policy of judicial independence considered vital by the authors of the Code. Second, this rule expedites the administration of estates, another goal of the Bankruptcy Reform Act. Third, the rule encourages rehabilitation by permitting the replacement of marginal with profitable business arrangements. (footnote omitted)

With these principles in mind, we turn to the issue of whether, under the business judgment test and on the Statement of Facts presented, Wheeling-Pittsburgh would be entitled to reject the agreements upon which the Receiver relies.

It is Wheeling-Pittsburgh's considered business judgment that of the six agreements mentioned earlier, five of them ought to be rejected. For this reason, Wheeling has filed a motion to reject these five agreements and has deferred its decision to reject the June 30, 1952 Lease Agreement, as supplemented, to a later date.

■ The Receiver's Statement of Facts does not allege that Wheeling-Pittsburgh's decision to reject is clearly erroneous, too speculative or contrary to the provisions of the Bankruptcy Code. Neither does the Statement of Facts allege that the decision to reject is a product of managerial incompetence at Wheeling-Pittsburgh. In other words, the Receiver's Statement of Facts has not raised any extraordinary circumstances which would prompt the court to second guess the debtor's presumptively sound business judgment. Such extraordinary circumstances may or may not be raised by a party in interest at the hearing on the motion to reject.[6] However, the facts which this court must consider in ruling on the 12(b)(6) motion are only those which appear in the Receiver's Statement of Facts. That Statement of Facts raises no extraordinary circumstances. Therefore, this court will not second guess the debtor's decision to reject. Accordingly, the court cannot say that on the facts presented, the business judgment test precludes the debtor from rejecting the alleged executory contracts and unexpired leases.

### III. Post-Petition Agreement

Having disposed of the theory that Wheeling-Pittsburgh is liable by virtue of a non-rejectable prepetition executory con-

---

**6.** A hearing on the debtor's motion to reject, which is required by Bankruptcy Rule 6006(c), has not yet been scheduled.

tract, the only remaining contract theory available to the Receiver is the existence of a postpetition assumption of liability by the debtor. This theory is easily disposed of. The Receiver's Statement of Facts does not allege facts which, if proved, establish the existence of a postpetition agreement pursuant to which Wheeling-Pittsburgh agreed to assume the costs of maintaining the Harmar Mine. Accordingly, the Receiver's alleged administrative claim finds no support in a postpetition contract theory.

### Conclusion

For the foregoing reasons, the court finds that the Receiver's Statement of Facts, when viewed in the light most favorable to the Receiver, fails to state a claim upon which the requested relief can be granted. Therefore, Wheeling-Pittsburgh's motion to dismiss will be, and hereby is, granted.