**In the Matter of TIMBERLINE PROPERTY DEVELOPMENT, INC.**

**Bankruptcy No. 89–05287.**

United States Bankruptcy Court, D. New Jersey.

June 14, 1990.

Michael A. Zindler, Markowitz & Zindler, for debtor.

Alan J. Baldwin, Broderick, Newmark & Grather, for Weichert Realtors.

Karen E. Bezner, Hill, Wallack & Masanoff, for Unsecured Creditors' Committee.

Ralph H. Kline, for Princeton Crossroads Realty.

## OPINION

WILLIAM H. GINDIN, Chief Judge.

### PROCEDURAL HISTORY

On September 26, 1989, Weichert Realtors filed a motion in this court seeking to be appointed a professional real estate broker for the debtor in connection with a sale of real estate to Denise and David Shipper and for recognition of a claim for commission. No certification or affidavit of disinterestedness accompanied the notice of motion. The application was based upon an exclusive listing agreement dated February 19, 1986. Princeton Crossroads Realty, selling broker for the property in question, filed a separate motion on October 11, 1989.[1] The motions were treated together.

---

1. The commission for Princeton Crossroads as selling broker is derivative of the commission

The movants requested an allowance of $26,950.00 in commissions for a sale which took place prior to the bringing of the motion.[2] The application is opposed by the Official Unsecured Creditors' Committee. The debtor supports the application, but filed no certification or brief.

## FACTS

On February 19, 1986, R. & R. Property Development, Inc., as owner of a parcel of real estate known as Squires Runne, entered into an exclusive listing agreement (hereinafter referred to as the "listing agreement") with Weichert Co. Realtors (hereinafter referred to as "Weichert"). The agreement originally expired by its own terms on February 28, 1987, but was extended by an addendum dated February 20, 1987, to expire August 31, 1987. While no explanation is given, the addendum indicates that the name of the owner was changed to Timberline Property Development, Inc., the name of the debtor herein (hereinafter referred to as "Timberline" or "debtor").

The lengthy agreement provides for a sales commission of five per cent (5%) on the base selling price of each home and ten per cent (10%) on "any lot or lots ... sold during the listing period." Such commissions were made due and payable on the day title closes. There is no specific provision for the establishment of a lien. The agreement is signed by several officers of Weichert and by I. Allen Rumberg as president of the debtor. In addition, Ellen Rumberg, wife of I. Allen Rumberg, signed as agent for Weichert. The same parties signed the addendum except for Mrs. Rumberg. The facts presented demonstrate beyond question that Mrs. Rumberg was

for Weichert. All references to Weichert hereafter refer to both brokers.

2. It should be noted that the application was for $26,950.00. In fact, 5% of the original price of $457,000.00 would yield $22,850.00 and 5% of the revised price of $450,000.00 would yield $22,500.00. The maximum commission allowable therefore is $22,500.

3. The court notes the relationship between the debtor and Mrs. Rumberg, and infers therefrom

merely an agent and, as such has no right to collect a commission from the debtor.[3]

On May 29, 1987, during the addendum period, Timberline entered into a contract (hereinafter referred to as the "sales agreement") with Denise and David Shipper for the purchase of one of the homes in the tract for $457,000.00 (later reduced to $450,000.00 by court order of September 13, 1989), known as Lot 36, Block 10. Various addenda in the contract, unexplained in the papers, increased the purchase price to $539,000.00. Since the original listing agreement provided for commission of five per cent on the "base selling price", this court finds that that price is $450,000.00 and that the commission thereon would be $22,500.00. The contract also contains a provision for the payment of the commission:

*Broker:* Seller will pay the broker, Weichert Realtors, a commission pursuant to a separate brokerage agreement. The commission shall be paid in consideration for services rendered by the broker in bringing about this sale. The commission shall not be deemed to have been earned until the delivery of the Deed and the payment of the balance of the purchase price and not otherwise ...

No other provision in the contract deals with the brokerage agreement. Note should be made of the fact that the contract does contain a prohibition against the recordation of the agreement *by the buyer.* The closing was to take place on January 15, 1988, but it did not occur until almost two years later in October, 1989.

In the interim and on July 7, 1989, the debtor filed a petition in bankruptcy and continued to operate its business as a debtor-in-possession. On September 6, 1989, the debtor filed a motion seeking leave to

the reason for the low profile taken by the debtor in this case. Whether the fact that Ellen Rumberg was an employee of Weichert, an officer of the debtor, and the wife of I. Allen Rumberg, the principal of the debtor, created a conflict of interest is not reached by the court since the application for appointment and payment of a commission was made by Weichert, not by Ms. Rumberg personally.

consummate the sale, which motion was granted by order of September 13, 1989. The closing had not yet taken place when Weichert brought its motion to be appointed.

## DISCUSSION

### I. WAS THERE A NOVATION?

Three significant changes occurred regarding the contract of sale between the date of the original contract and the date of closing. In the first place, since bankruptcy was filed, any change in the contract would require approval of this court. Secondly, the seller in the contract became a debtor-in-possession. Finally, the contract price was reduced from $457,000.00 to $450,000.00. These changes constitute a novation and make the contract post-petition.

■ Clearly, the requirement of court approval of the contract adds an element which did not exist prior to the filing of the petition. There is no requirement that a third party approve a normal contract. Under 11 U.S.C. § 363, however, the court must approve the sale of debtor's property if it is out of the ordinary course of business. Court approval adds an element to the determination, for the court must specifically find that such a sale is in the interest of creditors, is entered into in good faith, and is one in which the price represents fair value. *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986). A peppercorn no longer does the trick.

Furthermore, while there is a great similarity between a pre-petition debtor and a debtor-in-possession, they are, in fact, different entities for the purpose of assuming contracts. *Matter of West Electronics, Inc.*, 852 F.2d 79 (3d Cir.1988).

Finally, a change in the purchase price is obviously a new term. *S.N.W. Corp. v. Hauser*, 461 So.2d 188 (Fla.Dist.Ct.App. 1984), rev. den., 471 So.2d 43 (Fla.1985).

■ In general, a novation is a "substitution of a new contract for the old agreement." 15 Williston on Contracts, § 1865 (1972). Although the term "novation" is generally used to describe a change of parties to the contract, it is also used where the purchase price of a transaction is changed. In *S.N.W.*, 461 So.2d 188, the plaintiffs contracted to purchase two condominiums from the defendants. After tender of the deposits was refused, the parties entered into new agreements for the same units at a higher price. In reversing the trial court's judgment awarding the difference in purchase price to the buyers, the district court of appeal held that the purchase and sale agreements under which the transaction closed were novations of the original contracts. *S.N.W.*, 461 So.2d at 190. The court stated that "existence of a novation must be implied as a matter of law ... where the parties enter into an entirely new and unambiguous agreement of equal or greater dignity to the agreement first made with respect to the same subject." *Id.* at 189.

■ The *S.N.W.* court set out a four part test for a novation. These components are: (1) the existence of a previously valid contract; (2) the agreement to make a new contract; (3) the intent to extinguish the original contractual obligation; and (4) the validity of the new contract. *Id.* In the case *sub judice* there is no allegation that either contract is invalid. The fact that the purchase price was lowered shows intent to extinguish the original obligation. The buyers, no doubt, wanted the revised purchase price over the original, higher price, and the motion to approve the sale was brought before the court by the attorneys for the debtor. Thus, there appears to have been an agreement to make the new contract. Since the definition of a novation is satisfied, the change in purchase price makes the second agreement a novation, and the contract became post-petition.

Furthermore, courts have held that a novation occurs by the substitution of a new obligation for an old one between the parties as long as there is intent to extinguish the old obligation. *Morecraft v. Allen*, 78 N.J.L. 729, 732, 75 A. 920 (1910). In *Morecraft*, the plaintiff agreed to allow his aunt to take board in his home in exchange for her giving him rent on her own house and a

promise to convey to him her dwelling upon her death. When the aunt no longer desired to continue the arrangement, her nephew stated that she owed him $1000 but would accept $500 in settlement. The defendant denied the indebtedness and denied making an agreement for payment of $500. The court found that there was a new agreement made between the parties in substitution for the earlier agreement, which constituted a novation. *Morecraft*, 78 N.J.L. at 731, 75 A. at 921. See, *contra*, *San Gabriel Valley Ready–Mixt v. Casillas*, 142 Cal.App.2d 137, 298 P.2d 76 (Ct. App.1956). In the case *sub judice*, the original obligation of the Shippers to pay $457,000 for their unit was intentionally replaced by a later obligation to pay $450,-000 for the same unit, subject to court findings and approval.

█ In *Gordon v. Stevens Institute of Technology*, 31 N.J.Super. 177, 106 A.2d 15 (App.Div.1954) an associate professor was promoted to the rank of professor and given a new contract. There were still several months to run on the old contract. When he tried to collect under both contracts for the overlap period, the court held he could not, as the second contract constituted a novation. In light of *Morecraft* and *Gordon*, there was a novation and the Shipper sales contract was post-petition, so no lien can automatically attach to the land or its proceeds.

## II. DOES WEICHERT HAVE A LIEN AGAINST PROPERTY OF THE ESTATE?

█ The attorney for the broker asserts that his client is entitled to an equitable lien on the property or the proceeds of sale. While the third circuit recognizes such liens, their existence and ability to withstand the "strong arm powers" of the trustee is controlled by state law, unless the application of such powers would frustrate federal policy. *Lewis v. Diethorn*, 893 F.2d 648, 650 (3d. Cir.1990). This court need not reach this issue, however, since a lien cannot arise post-petition without court approval. 11 U.S.C. § 549(a) states that a trustee (and a debtor in possession under

§ 1107) may avoid a transfer of property of the estate that, *inter alia*, is not approved by the court. § 364(c)(2) states:

> If the trustee is unable to obtain unsecured credit ... as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien.

It may be argued that if the contract were severable into an agreement for sale and a listing agreement as in *In re Gardinier Inc.*, 831 F.2d 974, 976 (11th Cir.1987), cert. den. 488 U.S. 853, 109 S.Ct. 140, 102 L.Ed.2d 112 (1988), a commission may be due from the listing agreement, and under *Cohen v. Sheridan Estate*, 218 N.J.Super. 565, 566–67, 528 A.2d 101 (Ch.Div.1987) an equitable lien would attach to the land or its proceeds. However, as pointed out above, a lien cannot be imposed on property of the estate without court approval. 11 U.S.C. § 363(b)(1) requires prior court approval of any transaction of a Chapter 11 debtor. The bankruptcy court, under 11 U.S.C. § 549(a) must approve a post-petition transfer of property of the estate. Since attachment of a lien is such a transfer, it is subject to court approval. 11 U.S.C. § 101(50). The transfer takes place at the time the lien attaches. *Matter of Compton Corp.*, 831 F.2d 586 (5th Cir. 1987). The right to the commission itself arises at the time of sale. *Ellsworth Dobbs v. Johnson*, 50 N.J. 528, 236 A.2d 843 (1967).

## III. MAY WEICHERT COMPEL THE DEBTOR TO ASSUME THE LISTING AGREEMENT AS A PREPETITION EXECUTORY CONTRACT?

The Bankruptcy Code does not define an executory contract. However, the legislative history of 11 U.S.C. § 365 identifies it as one "on which performance remains due to some extent on both sides." Notes of the Committee on the Judiciary, S.R.Rep. No. 989, 95th Cong., 2d. Sess. 58 (1978), contained in 1978 U.S.Code Cong. & Admin. News 5787, 5844. See also, *Matter of*

*Dunes Casino Hotel,* 63 B.R. 939, 948 (D.N.J.1986).

Professor Vern Countryman developed an oft-cited definition of an executory contract which reflects the legislative history of § 365. He identified an executory contract as

[A] contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other.

Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn.L.Rev. 439, 460 (1973), cited in *Dunes,* 63 B.R. at 948, *In re Bellamah Community Dev.,* 107 B.R. 337, 341 (Bankr.D.N.M.1989). The Countryman test should be applied as of the date the petition in bankruptcy was filed. *In re Norquist,* 43 B.R. 224, 230 (Bankr.E.D.Wash.1984).

■ The courts should use a flexible approach in determining whether a contract is executory. In *Matter of Willingboro Country Club,* 69 B.R. 414, 416 (Bankr.D.N.J.1987), this court suggested that although there are various tests to determine whether a contract is executory, the legislative history and case law require that each case be considered on its own facts and a nonrigid approach be taken. Since the contract for sale had not been consummated as of the date of filing, there remained action required by both parties to both the listing agreement and the sales agreement, and they must be deemed executory.

■ A listing agreement cannot be assumed, however, unless the real estate broker has been retained pursuant to 11 U.S.C. § 327. In *In re Channel 2 Assoc.,* 88 B.R. 351 (Bankr.D.N.M.1988), the debtor moved, *inter alia,* for assumption of a broker's listing agreement as an executory contract. The broker had not been appointed by the bankruptcy court to work for the debtor. In fact, the court denied *nunc pro tunc* appointment. *Channel 2,* 88 B.R. at 351, n. 1. As a preliminary matter, the court found that a broker is a professional per-

son. *Id.* at 352. Although the broker in that case was dealing in personal property, the fact that real property is involved in this case is irrelevant. *Id.* The broker is a professional and is governed by 11 U.S.C. § 327(a). See *In re Roberts,* 58 B.R. 65, 67 (Bankr.D.N.J.1986). The court did not reach the issue of whether the contract was executory. It held

... § 365 cannot be used to circumvent the requirements of § 327. Even if the contract were executory, the debtor seeks to pay a professional person. Compensation for professionals is governed by § 330, which requires § 327 court approval.

*Channel 2,* 88 B.R. at 352–53.

Thus, since there was no *nunc pro tunc* appointment of Weichert, Timberline cannot assume the listing agreement even if the contract is deemed executory.

## IV. DID THE SALE TO DENISE AND DAVID SHIPPER GIVE RISE TO THE RIGHT OF WEICHERT TO AN ADMINISTRATIVE EXPENSE?

The Bankruptcy Code allows certain expenses incurred by a debtor to be given priority over other debts owed. 11 U.S.C. § 503 permits, *inter alia,* the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case. § 503(b)(1)(A). Cases interpreting this provision have often read its language literally and required that any expenses to be characterized as administrative have to have been incurred after the debtor filed bankruptcy.

■ Assumption of an executory contract enables pre-petition obligations arising thereunder to be treated as administrative expenses. *In re Wheeling–Pittsburgh Steel Corp.,* 59 B.R. 129, 132 (Bankr.W.D.Pa.1986). In *Wheeling,* Harmar, a creditor, moved for an administrative claim against the debtor for costs of maintaining a mine owned by the creditor. The parties had entered into a prepetition contract for management of a mine by the debtor. The debtor then moved for dismissal for failure

to state a claim on which relief could be granted under Fed.R.Civ.P. 12(b)(6). In holding that the contracts were properly rejected, the court commented that

> If ... these agreements are prepetition executory contracts ... which are not entitled to court approval for rejection, Wheeling–Pittsburgh must assume these agreements, thereby assuming Harmar's maintenance costs as costs of administration.

*Wheeling–Pittsburgh*, 59 B.R. at 135. If a prepetition executory contract is rejected, however, the creditor will only have a prepetition unsecured claim. *Id.* See also *In re Cafe Partners/Washington 1983*, 90 B.R. 1, 8 (Bankr.D.D.C.1988), *R and O Elevator Co. v. Harmon*, 93 B.R. 667, 672 (D.Minn.1988), *In re Gamma Fishing Co.*, 70 B.R. 949, 952 (Bankr.S.D.Cal.1987). The court in *In re Coast Trading Co.*, 744 F.2d 686, 692 (9th Cir.1984), stated the rule succinctly

> Obligations under contracts which are executory at the time bankruptcy is filed are payable as an administrative expense priority when the executory contract has been assumed properly by the bankrupt.

While the above cited rule is the general rule, some courts distinguish between a right to payment that accrued pre-petition and such a right that accrued after bankruptcy was filed. In *Matter of Jartran, Inc*, 732 F.2d 584 (7th Cir.1984), the court held that only if the obligation to pay matured post-petition would a creditor in an assumed executory contract be permitted to have its debt receive an administrative expense priority under 11 U.S.C. § 503. In *Jartran*, the debtor, before filing bankruptcy, placed advertisements for publication in telephone directories and was irrevocably committed to pay for the advertisements several months before the books were to be published. However, Jartran would not be billed for the services until after the books were published. *Jartran*, 732 F.2d at 585. The appellants, an advertising agency and the entity which agreed to place the advertisements for the debtor, claimed that the debt should be treated as an administrative expense since the advertisements were published after bankruptcy

was filed and benefitted the debtor's business. *Id.* at 586.

In holding that the debt could not be given an administrative expense priority, the court found as the determinative factor that

> ... the transaction out of which these benefits arose was completed before the petition was filed and nothing could have been done to further or cancel the transaction after the petition filing. Thus, the matter was outside the scope of § 503.

*Id.* at 589.

The court looked to see when the debtor induced its creditors to do the required work, which was pre-petition. The decision, the court stated, was required to be in accordance with the goal of the administrative expense rules.

> To serve the policy of the priority, inducement of the creditor's performance **by the debtor-in-possession** is crucial to a claim for administrative priority in the context of the furnishing of goods or services to the debtor ... Administrative priority is granted to post-petition expenses so that third parties will be moved to provide the goods and services necessary for a successful reorganization ... In the case before us no inducement by the debtor-in-possession was required because the liability for the cost of the ads was irrevocably incurred before the petition was filed.

*Id.* at 587–88 (emphasis in the original). See also, *In re Public Ledger Inc.*, 161 F.2d 762 (3d Cir.1947), *In re SMB Holdings Inc.*, 77 B.R. 29, 32 (Bankr.W.D.Pa.1987), and *In re Massetti*, 95 B.R. 360, 363 (Bankr.E.D.Pa.1989).

Furthermore, the appellants argued that they should be given an administrative expense priority based on equity and fairness. The court did not find this argument persuasive since these creditors did not incur any greater hardships by virtue of the bankruptcy than any others, and all creditors assume the risk that their debtors may file bankruptcy. *Jartran*, 732 F.2d at 590.

In the case *sub judice*, the contract of sale for the property was not consummated

until October 1989, while the Chapter 11 petition was filed in early July of that year. Under *Ellsworth Dobbs v. Johnson, supra* 50 N.J. at 551, 236 A.2d 843, the owner/seller of property becomes liable for the real estate commission upon performance of the contract by the buyer. The signing of a real estate contract, however, is not enough to entitle the broker to a commission, as the owner hires a broker with the expectation of becoming liable for a commission only if the sale is consummated, unless title does not pass because of the owner's conduct. *Ellsworth Dobbs*, 50 N.J. at 548, 236 A.2d 843. Since Weichert is deemed to have earned its commission postpetition, it would have been entitled to payment of its commission as an administrative expense but for the fact that this court never ordered its retention.

## V. MAY WEICHERT NOW CLAIM *NUNC PRO TUNC* APPOINTMENT?

█ It is a generally recognized rule that compensation or administrative expenses cannot be granted from the debtor's estate for professional services unless the court has authorized both the employment and the services prior to performance of the services. *In re Ewing*, 54 B.R. 952 (D.C.1985); *In re Carolina Sales Corp.*, 45 B.R. 750, 752–53 (Bankr.E.D.N.C.1985); *In re Pathway Inc.*, 41 B.R. 400, 401 (Bankr. D.Haw.1984); *In re Mansfield Tire & Rubber Co.*, 65 B.R. 446, 465–66 (Bankr.N.D. Ohio 1986). In *F/S AirLease II v. Simon*, 844 F.2d 99 (3d Cir.1988), *cert. den.* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110, a debtor under 11 U.S.C. Chapter 11 and its two principal creditors appealed an order of the district court affirming a bankruptcy court's *nunc pro tunc* appointment of a broker for professional services provided to the debtor in obtaining a lease for a plane. The broker cross-appealed the district court's order vacating the bankruptcy court's monetary award. *AirLease*, 844 F.2d at 101–03. The broker had filed a petition for payment of administrative expenses pursuant to 11 U.S.C. § 503. The bankruptcy court approved his employment *nunc pro tunc* and awarded him his fee. *Id.* at 102. See *In re F/S Airlease II*, 59

B.R. 769 (Bankr.W.D.Pa.1986), vacated, 84 B.R. 389 (W.D.Pa.1986), rev'd, 844 F.2d 99 (3rd Cir.1988).

In reversing the bankruptcy court's granting of an administrative expense priority to the broker, the Third Circuit considered § 503(b)(2) and § 503(b)(1)(A). *Id.* at 108–09. § 503(b)(2) allows as an administrative expense compensation and reimbursement awarded under § 330(a) of the Code. However, for such expense to be allowed by the court, the professional, such as a broker, must receive court approval prior to rendering services to the estate per § 327(a). *Id.* A broker cannot use § 503(b)(1)(A) to circumvent § 327(a). The court reasoned that if a broker were allowed compensation under § 503(b)(1)(A), § 327(a) would be invalidated and Congress' intent in providing for prior approval would be contravened. § 503(b)(1)(A) encompasses costs such as expenditures for repairs, upkeep, rent, taxes, and "other costs incidental to protection and conservation of the estate." *Id.* at 108.

The court in *Airlease* implied that an administrative expense could be allowed where the broker or other professional received *nunc pro tunc* appointment from the bankruptcy court. However, the standards for such retention are difficult to meet and such employment should only be granted in extraordinary circumstances. *Id.* at 105; *Matter of Arkansas Co.*, 798 F.2d 645, 650 (3d Cir.1986). The Third Circuit adopted a two-part test for retroactive approval in *Arkansas* which was utilized in *Airlease:*

1. The bankruptcy court must find, after a hearing, that the applicant satisfies the disinterestedness requirements of § 327(a) and would therefore have been appointed initially; and

2. The court must, in its discretion, determine that the particular circumstances presented are so extraordinary as to warrant retroactive approval. *Arkansas,* 798 F.2d at 650; *Airlease,* 844 F.2d at 105.

Among the factors to be considered in making the determination are:

1. Whether the applicant or some other person bore responsibility for applying for approval;

2. Whether the applicant was under time pressure to begin service without approval;

3. The amount of delay after the applicant learned that the initial approval had not been granted;

4. The extent to which compensation to the applicant will prejudice innocent third parties; and

5. Other relevant factors. *Arkansas* at 650; *Airlease* at 105–06. See also, *Matter of Freehold Music Center, Inc.,* 49 B.R. 293 (Bankr.D.N.J.1985).

Among the "other relevant factors" the *AirLease* court examined in refusing to approve *nunc pro tunc* appointment were the attorney's bankruptcy experience. *Id.* at 106–07. Furthermore, the "time pressure factor" relates only to whether there is sufficient time to request court approval before the professional's services must begin. *Id.* at 107. The court reiterated that for the time pressure factor to be significant, there must be an emergency situation in which services have to be initiated within a very short period before approval could be sought. *Id.* An example of such exigency would be where counsel was retained by a creditors' committee just two weeks before a crucial meeting and was required to prepare immediately. *Id.* The court refused to consider the value of the professional services provided the estate when deciding on retroactive approval. *Id.* at 108, quoting *In re Mason,* 66 B.R. 297, 307 (Bankr.D.N.J.1986).

 In the case at bar, the test for *nunc pro tunc* approval has not been satisfied. There was no time pressure to begin services without prior court approval. Weichert, as a well-known real estate broker in New Jersey, should have known that it needed approval of this court before performing work for the debtor. Since Weic-

hert is not entitled to *nunc pro tunc* approval, it is not entitled to receive an administrative expense priority for its claim against the debtor.

## VI. IS WEICHERT ENTITLED TO A GENERAL UNSECURED CLAIM?

 Since Weichert does not have a lien on the property or the proceeds of sale and cannot claim an administrative expense priority, it is relegated to a position as a general unsecured creditor. In *In re Charter Co.,* 52 B.R. 267, 271 (Bankr.M.D.Fla. 1985), the court held that where a broker's fee does not qualify as an administrative expense, since the broker had not been authorized by the court to perform services for the estate, the broker has a general unsecured claim for its commission. Although the *Charter* case involved Florida brokerage law, which considers a broker's fee to be earned when the broker produces a purchaser ready, willing, and able to purchase the property on terms acceptable to the seller, the court found that the fee was earned. This is the same result that obtains under *Ellsworth Dobbs,* 50 N.J. 528, 236 A.2d 843.[4]

## VII. CONCLUSIONS

A. Since the purchase price in the sales contract was changed, the parties changed, and the sale required court approval, there was a novation.

B. The contract was, therefore, post-petition, and no lien could be imposed on property of the estate without court approval. The court hereby denies imposition of the lien.

C. The contract was not assumable as an executory contract.

D. Since Weichert was never retained by this court to perform brokerage services for the debtor and does not qualify for *nunc pro tunc* approval, it is not entitled to receive an administrative expense priority for its brokerage commission.

---

**4.** In the instant case, the original brokerage agreement established the right to the commission as a matter of contract right. It should be noted that a claim based purely on *quantum meruit* cannot be allowed. *In re C.H. Stuart, Inc.,* 16 B.R. 296 (Bankr.W.D.N.Y.1981).

E. Since Weichert contracted to earn its brokerage fee pre-petition, its commission is to be considered a general unsecured claim.

Counsel for debtor-in-possession is directed to submit an order consistent with this opinion.